**PRECISION PINE & TIMBER, INC.,** Plaintiff,

v.

**THE UNITED STATES,** Defendant.

No. 98–720 C.

United States Court of Federal Claims.

July 30, 2001.

Alan I. Saltman, Washington, DC, counsel of record for plaintiff. Richard W. Goeken, Washington, DC, of counsel.

James C. Caine, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for defendant, with whom on the briefs were Kathryn A. Bleecker, Assistant Director; David M. Cohen, Director; and Stuart E. Schiffer, Acting Assistant Attorney General. Lori Polin Jones and Patricia Leigh Disert, U.S. Department of Agriculture, of counsel.

## OPINION

DAMICH, Judge.

This contract case is before the Court on the Defendant's motion to dismiss or, in the alternative, for summary judgment on the issue of liability, dated July 12, 2000, and the Plaintiff's cross-motion for summary judgment, dated September 11, 2000. At issue are 14 timber sale contracts that were suspended by the Forest Service. After consideration of the arguments presented by both parties in their initial and supplemental briefs and at oral argument, the Court determines, for the reasons enumerated below, that the Forest Service breached its implied duty to cooperate with respect to 7 of the contracts and its implied duty not to hinder 11 of the contracts when it suspended them. Therefore, the Court DENIES the Defendant's motion to dismiss or, in the alternative, for summary judgment, and GRANTS, in part, the Plaintiff's motion for summary judgment as to liability.

## TABLE OF CONTENTS

I. Background ............................................................. 38
 A. Introduction ........................................................ 38
 B. Events Leading Towards the Suspension of the Subject Contracts ........... 40
 1. Relevant Contractual Terms ...................................... 40
 2. Consultation Requirements Under the ESA ......................... 41
 3. The Forest Service's Strategy to Avoid Submission of Forest Plan
 for Consultation in Response to the Proposed Listing of the
 Mexican Spotted Owl ........................................... 41
 4. The Listing of the Mexican Spotted Owl ........................... 42
 5. The *Pacific Rivers* Decision and the Continuing Strategy of
 the Forest Service to Avoid Submission of Forest Plans for
 Consultation ................................................. 43
 6. *Silver v. Thomas* Litigation ................................... 45
 C. Suspension of the Contracts at Issue .................................. 46
 D. Consultations on Existing LRMPs During the Period of Suspension ......... 47

E. The Plaintiff's Submitted Claims ...................................... 51

II. Motion to Dismiss .................................................. 52
 A. Standard ...................................................... 52
 B. The Plaintiff's Complaint Does Not Sound in Tort and States a Claim
 for Which Relief Can Be Granted ................................. 52

III. Standard for Summary Judgment ...................................... 57

IV. The Forest Service Possessed Authority to Suspend Timber Contracts ........... 57

V. The Express Right to Suspend the Contracts is Interpreted in Light of the
 Implied Duties to Cooperate and Not to Hinder ........................ 58
 A. Standard for Finding a Breach of the Implied Duties to Cooperate and
 Not to Hinder ................................................. 58
 B. The Right to Suspend Is Qualified by the Implied Duty Not to Hinder ...... 59

VI. The Forest Service Breached Its Implied Duty to Cooperate by Breaching
 an Express Warranty Contained in CT 6.25 .............................. 65
 A. Clause CT 6.25 Contains an Express Warranty .......................... 65
 B. Whether the Forest Service Breached Its Express Warranty .............. 67
 1. The Forest Service Had a Reasonable Basis for Failing to Consult
 with the FWS at the Time of the Listing of the Mexican Spotted
 Owl ....................................................... 67
 2. The Forest Service Did Not Have a Reasonable Basis for Failing to
 Consult with the FWS after the *Pacific Rivers* Decision. .............. 68

VII. The Forest Service Breached Its Implied Duty Not to Hinder 11 of the
 Contracts at Issue When It Suspended the Contracts at Issue ............... 70
 A. The Forest Service Suspended the Contracts at Issue by Its Own Fault ...... 70
 B. The Length of the Suspension of 11 of the 14 Contracts Was Unreason-
 able .......................................................... 70
 C. The Plaintiff's Operations Were Significantly Hindered by the Delays ...... 71

VIII. The Suspensions of the Contracts Were Not Sovereign Acts .................... 72

IX. Conclusion ........................................................ 73

## I. Background

### A. Introduction

Between January 1990 and July 1995, the Forest Service awarded 14 timber sale contracts in Arizona to the Plaintiff or other timber purchasers from whom the Plaintiff subsequently acquired the contracts.[1] These contracts were suspended by the Forest Service on August 25, 1995, after being ordered to do so by a federal district court. *Silver v. Babbitt*, 924 F.Supp. 976, 989 (D.Ariz.1995). The suspensions were ordered by the district court because the Forest Service failed to submit its Land and Resource Management Plans ("LRMPs" or "Forest Plans") in Re-

---

1. The contracts and their award dates are as follows:

| Contract | Number | Award Date |
|----------|--------|------------|
| Hay | 001152 | 06/24/91 |
| St. Joe | 001582 | 10/16/92 |
| O.D. Ridge | 001574 | 08/14/92 |
| U–Bar | 005051 | 10/05/92 |
| Jersey Horse | 001756 | 12/13/93 |
| Salt | 005937 | 02/28/94 |
| Hutch–Boondock | 005465 | 06/29/94 |
| Mud | 005556 | 09/14/94 |
| Monument | 005564 | 09/28/94 |
| Saginaw–Kennedy | 006585 | 09/29/94 |
| Brann | 006577 | 09/29/94 |
| Manaco | 004625 | 01/17/95 |
| Brookbank | 001822 | 04/13/95 |
| Kettle | 001830 | 07/20/95 |

Precision Pine obtained the Hay timber sale from another timber purchaser with Forest Service approval on June 24, 1991. Precision Pine obtained the St. Joe timber sale from another timber purchaser by third-party agreement approved by the Forest Service on October 16, 1992. (Pl.'s Cross–Mot. at App. 607–08.)

gion 3 of the Forest Service for consultation with the Fish and Wildlife Service ("FWS") as it was required to do by section 7 of the Endangered Species Act ("ESA") when the Mexican spotted owl was listed as a threatened species.[2] *Id.* These contracts remained suspended until December 4, 1996. The Forest Service maintains that certain provisions in the contracts authorized the suspensions. The Plaintiff, however, argues that the suspensions breached the Forest Service's implied duties to cooperate and not to hinder the contracts. More specifically, the Plaintiff argues that the breach of the implied duty to cooperate was caused by the Forest Service's misrepresentation that it had identified the measures that were necessary for the protection of all species listed under the ESA (i.e., restrictions on timber sale activities) and had included those measures in the contract. However, because the Forest Service had not submitted its Region 3 Forest Plans for consultation with the FWS as it was required by law to do, the Plaintiff maintains that the Forest Service had no reasonable basis to know whether the restrictions on logging contained in the contracts were adequate.[3] The Plaintiff also maintains that the failure of the Forest Service to timely submit its LRMPs for consultation was unreasonable. Because the cause of the suspensions was unreasonable, the Plaintiff maintains that the suspensions breached the Forest Service's implied duty not to hinder the contracts.

The factual narrative below describes, in more or less chronological order, the circumstances surrounding the listing of the Mexican spotted owl as a threatened species, the Forest Service's protracted resistance to the submission of its Region 3 LRMPs for con-

sultation to the FWS, the *Silver v. Thomas* litigation which led to the suspension of the contracts at issue, and the protracted length of the suspensions. All of these circumstances, in large part the result of missteps by the Forest Service, tie in to the claim that the Forest Service breached its implied duties to cooperate and not to hinder the contracts when it suspended them. Because the factual narrative is lengthy, it has been divided into sections. First, the contractual provisions which purport to give the Forest Service authority to impose suspensions is discussed. Second, the statutory duties of the Forest Service relevant to this case is outlined. Third, the strategy of the Forest Service to avoid submission of its Region 3 Forest Plans for consultation in the aftermath of a proposal to list the Mexican spotted owl and adverse decisions in the Ninth Circuit is summarized. Fourth, the final rule that lists the Mexican spotted owl as a threatened species and the adequacy of the Forest Service's protective measures in the eyes of the Fish and Wildlife Service is briefly discussed. Fifth, the continuing strategy of the Forest Service to avoid submitting Region 3 Forest Plans in the face of the listing of the Mexican spotted owl and another adverse decision in the Ninth Circuit is summarized. Sixth, the ongoing strategy of the Forest Service to avoid submission of its Forest Plans for consultation in the face of the *Silver v. Thomas* litigation that resulted in the suspension of the contracts at issue is discussed. Seventh, the suspension of the contracts and the harm to the timber industry that the Forest Service knew would be caused by the suspensions is discussed. Finally, the protracted consultation process during the period of suspension is discussed in detail.[4]

---

**2.** All federal agencies, including the Forest Service, are required to engage in formal consultations with the FWS, as appropriate, in order to "utilize their authorities in furtherance of the purposes of this chapter [of the ESA] by carrying out programs for the conservation of endangered species and threatened species listed pursuant to [the ESA]." 16 U.S.C. § 1536(a)(1).

**3.** The Plaintiff characterizes this claim in different terms, such as a misrepresentation or a violation of an express warranty or a violation of the implied duties to cooperate and not to hinder the contracts. For the sake of simplicity, cogency,

and avoidance of redundancy, the Court analyzes this claim in terms of whether the contract contained a specific warranty that was breached, thereby breaching the implied duty to cooperate. The nature, analysis, and outcome of the claim is the same regardless of how it is characterized.

**4.** In its cross-motion for summary judgment, the Plaintiff has amply documented the findings of fact contained in the factual narrative below. To the extent that the Defendant has disputed some of the facts contained in the foregoing narrative, it has only disputed the manner in which the Plaintiff has characterized certain documents.

B. Events Leading Towards the Suspension of the Subject Contracts

1. Relevant Contractual Terms

The contracts at issue in this case, with the exception of one called the Hay contract, contain Special Contract Provision CT6.01, "Interruption or Delay of Operations," which gives the Forest Service the right to suspend operations under timber sale contracts as follows:

Purchaser agrees to interrupt or delay operations under this contract, in whole or in part, upon the written request of the contracting officer:

(a) To prevent serious environmental degradation or resource damage that may require contract modification under C8.3 or termination pursuant to C8.2;

(b) To comply with a court order, issued by a court of competent jurisdiction; or

(c) Upon determination of the appropriate Regional Forester, Forest Service, that conditions on this sale are the same as or nearly the same as conditions existing on sale(s) named in such an order as described in (b).

Purchaser agrees that in the event of interruption or delay of operations under this provision, that its sole and exclusive remedy shall be: (1) Contract Term Adjustment pursuant to BT8.21, or (2) when such an interruption or delay exceeds 30 days during Normal Operating Season, Contract Term Adjustment pursuant to BT8.21, plus out-of-pocket expenses incurred as a direct result of interruption or delay of operations under this provision. Out-of-pocket expenses do not include lost profits, replacement cost of timber, or any other anticipatory losses suffered by Purchaser. Purchaser agrees to provide receipts or other documentation to the Contracting Officer which clearly identify and verify actual expenditures.

(Def.'s Mot. at App. 1.)

Each of the contracts at issue, including the Hay contract, contained Special Contract Clause CT 6.25, "Protection of Endangered Species," which, in the event a new species is listed under the ESA, allows the Forest Service to modify or unilaterally cancel timber contracts to provide additional protection for endangered or threatened species.[5] (Def.'s Mot. at App. 2.) This clause provides as follows:

Location of areas needing special measures for protection of plants or animals listed as threatened or endangered under the Endangered Species Act of 1973 and R–3 Sensitive Plant and Animal Species List are shown on Sale Area Map and identified on the ground. Measures needed to protect such areas have been included elsewhere in this contract or are as follows:

\* \* \*

If protection measures prove inadequate, if other such areas are discovered, or if new species are listed on the Endangered Species List, Forest Service may either cancel under CT 8.2 or unilaterally modify this contract or provide additional protection regardless of when such facts become known. Discovery of such areas by either party shall be promptly reported to the other party.

In the event of contract modification under this Subsection, Purchaser shall be reimbursed for any additional protection required by the modification, provided that any work or extra protection required shall be subject to prior approval by the Forest Service. Amount of reimbursement shall be determined by Forest Service using standard Forest Service rate redetermination methods in effect at time of agreed change and shall be in the form of a reduction in Current Contract Rates unless

Thus, the Court finds that there is no genuine issue of material fact in dispute.

5. "Endangered species" means any species (other than certain insect species) "which is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532. "Threatened species" means any species which is likely to become an endangered species within the foreseeable future throughout all or a portion of its range. *Id.*

agreed otherwise in writing. However, in no event may Current Contract Rates be reduced below Base Rates.

(Def.'s Mot. at App. 2.)

### 2. Consultation Requirements Under the ESA

Activities, including timber sales, in National Forests are governed by the LRMP for each forest. 16 U.S.C. § 1604(f)(5). Each timber sale offered by the Forest Service must be "consistent" with the LRMP for the National Forest on which it is offered. 16 U.S.C. § 1604(i).

The ESA requires federal agencies, in this case, the Forest Service, to consult with the FWS before making any "irreversible or irretrievable commitment of resources" in order to insure the protection of endangered and threatened species.[6] Pursuant to the regulations implementing the ESA, formal consultations are to be completed within 90 days. 50 C.F.R. § 402.14. After consultations, the FWS issues a Biological Opinion ("BO"), which is a determination issued by the FWS as to whether a particular "agency action" is likely to jeopardize the listed species and which describes, if necessary, reasonable and prudent alternatives that will avoid a likelihood of jeopardy. 16 U.S.C. § 1535(b)(3)(A). The agency is expected to comply with the BO. *Id.* A BO is to be issued within 45 days after formal consultations. 50 C.F.R. § 402.14(e).

The Ninth Circuit in *Lane County Audubon Society v. Jamison*, 958 F.2d 290, 293 (9th Cir.1992), and *Pacific Rivers Council v. Thomas*, 30 F.3d 1050, 1053 (9th Cir.1994), has held that LRMPs are "agency action"

pursuant to the ESA and that consultations must be reinitiated on an existing LRMP if a new endangered species is listed. Furthermore, the implementing regulations of section 7 of the ESA provided that "reinitiation of formal consultation is required and shall be requested by the Federal agency or by the [Fish and Wildlife] Service where discretionary Federal involvement or control over the action has been retained or is authorized by law and ... (d) If a new species is listed or critical habitat designated that may be affected by the identified action." 50 C.F.R. § 402.16(d). Thus, the Forest Service was required to reinitiate consultations with the FWS on existing LRMPs, despite the fact that the Mexican spotted owl was not listed as endangered until 1993, after the LRMPs for National Forests in Region 3 were completed between 1985 and 1988. (Pl.'s Cross–Mot. at App. 299.)[7]

### 3. The Forest Service's Strategy to Avoid Submission of Forest Plans for Consultation in Response to the Proposed Listing of the Mexican Spotted Owl as a Threatened Species

On or about December 21, 1989, Robin Silver, M.D., (later the lead plaintiff in *Silver v. Thomas*) petitioned the FWS to list the Mexican spotted owl as threatened or endangered under the ESA, 16 U.S.C. § 1531, *et seq.*, claiming that existing regulations were inadequate and accusing the Forest Service of compromising scientific concerns in order to continue logging activities.[8] (Pl.'s Cross–Mot. at App. 122–26.) The Forest Service opposed the petition and attempted to stave off listing by various means, including: revis-

---

**6.** Section 7(a)(2) of the ESA provides that each Federal agency, "shall, in consultation with and with the assistance of the Secretary [of the Interior], insure that any action authorized, funded, or carried out by such agency is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2). The Secretary of the Interior has delegated responsibility for consultations to the FWS in this instance. 50 C.F.R. § 402.01(b). Section 7(d) of the ESA mandates that the Forest Service may not make any "irreversible or irretrievable commitment of resources" during consultations. 16 U.S.C. § 1536(d).

**7.** In *Pacific Rivers*, the Forest Service had disputed that the LRMP was agency action and that consultations on existing LRMPs had to be reinitiated. *See* discussion, *infra*, § I(B)(v).

**8.** In his petition, Dr. Silver claimed that the listing of the Mexican spotted owl was necessary because "existing regulatory mechanisms for protecting the owl are inadequate" (Pl.'s Cross–Mot. at App. 122) and that " '[p]rotection' of the Mexican spotted owl currently consists of USDA Forest Service (USFS) non-legally binding policy guidelines, that have compromised scientific concern to insure continued, excessive timber quotas." *Id.*

ing its forest management guidelines by means of non-binding directives, disputing FWS findings in the press, and beginning the process of preparing a new conservation strategy to be included in the Region 3 Forest Plans. (Pl.'s Cross–Mot. at App. 127–43, 153–97.)

Furthermore, even if the Mexican spotted owl were to be listed, the Forest Service hoped for reversal of the decision in *Lane County*, 958 F.2d at 293, that programmatic management plans used to implement timber sales were "agency action." This decision required government agencies to consult with the FWS under section 7 of the ESA whenever a newly listed species could be affected by activities conducted pursuant to a timber management plan. The timber management plans in *Lane County* were analogous to the LRMPs in Region 3.

Unfortunately for the Forest Service, the Mexican spotted owl was listed as an endangered species on April 15, 1993, (*Endangered and Threatened Wildlife and Plants; Final Rule To List the Mexican Spotted Owl as a Threatened Species*, 58 Fed.Reg. 14,248 (March 16, 1993)), and the *Lane County* decision was affirmed. *Lane County*, 958 F.2d at 293. Importantly, *Lane County* also held that timber sales were "irreversible and irretrievable commitments of resources" under section 7(d) of the ESA. *Lane County*, 958 F.2d at 295. This meant that, during the period of consultation on the timber management plans, no timber sales could proceed. Thus, if *Lane County* was interpreted to mean that Region 3 of the Forest Service was required to submit its existing LRMPs

for consultation upon the listing of a species under the ESA, then all timber sales would have to be suspended during the course of consultation.

### 4. The Listing of the Mexican Spotted Owl

In listing the Mexican spotted owl as endangered, the FWS mentioned several factors, one of which was the present or threatened destruction, modification, or curtailment of habitat or range.[9] Under this factor, timber harvest practices in New Mexico and Arizona were listed as a primary contributor to the Mexican spotted owl's listing as a threatened species along with other human activities and natural causes. *Id.* In its response to comments received regarding the proposed listing, the FWS took the position that the Forest Service's LRMPs in Region 3 were not adequate to assure the protection of the Mexican spotted owl.[10]

In response to the listing of the Mexican spotted owl as a threatened species, the Forest Service submitted for formal consultations with the FWS four separate "iterations" of projects that Forest Service biologists had determined "may affect" the Mexican spotted owl. However, the Forest Service did not submit any of its existing LRMPs for its forests in Region 3 for consultation with the FWS. (Pl.'s Cross–Mot. at App. 226–30.) In response to the "iterations" of projects, the FWS issued three BOs for the projects submitted for consultation by Region 3 of the Forest Service. (Pl.'s Cross–Mot. at App. 231–55.) Howev-

---

**9.** The other factors were: (1) the overutilization for commercial, recreational, or scientific, or educational purposes; (2) disease or predation; (3) inadequacy of existing regulatory mechanisms; and (4) other natural or man-made factors affecting the owls' continued existence.

**10.** The Final Rule listing the Mexican spotted owl stated in relevant part:

Forest Plans for the next decade for the 11 national forests in New Mexico and Arizona call for continued conversion of habitat to a non-suitable habitat at a rate of 0.4 percent per year. The habitat lost under a shelterwood harvest system is permanently maintained in a condition not suitable as owl habitat. This loss of habitat will, in time, result in the endanger-

ment of the owl. Forest plans [LRMPs] govern forest practices and, as long as they are in effect, the Service cannot ignore their content. 58 Fed.Reg. at 14,253. ·

\* \* \* \* \* \*

The Service [FWS] recognizes and appreciates the efforts the Forest Service had taken to reduce the impacts of its management on the Mexican spotted owl. However, the Service does not believe that the Forest Service's interim directives provide adequate long-term protection to guarantee the long-term existence of the owl across its range. The Forest Service has not yet been able to develop and adopt a conservation strategy that the Service believes will adequately protect the owl. 58 Fed.Reg. at 14,263.

er, in each BO, the FWS recommended that the Forest Service enter into a "true" programmatic consultation on a region-or forest-wide basis. (Pl.'s Cross–Mot. at App. 234, 243, 252.)

5. The *Pacific Rivers* Decision and the Continuing Strategy of The Forest Service to Avoid Submission of Forest Plans for Consultation

On October 25, 1993, the United States District Court for the District of Oregon ruled that LRMPs that existed prior to the listing of a species under the ESA were "agency action" for which the Forest Service was required to reinitiate consultation under the ESA whenever a new species is listed. *Pacific Rivers Council v. Robertson*, 854 F.Supp. 713, 723 (D.Or.1993). The effect of this ruling was that the LRMPs in Region 3 which were enacted prior to the listing of the Mexican spotted owl would need to be submitted for consultation and that timber sales contracts would need to be suspended.

Shortly afterwards, on December 10, 1993, Earthlaw, an environmental public-interest organization, sent a Notice of Intent to Sue ("NOIS") on behalf of several southwest-based environmental organizations to the Secretary of Agriculture, the Chief of the Forest Service, the Secretary of the Interior and the Director of the FWS. (Pl.'s Cross–Mot. at App. 256–60.) The NOIS stated, among other things, that the Forest Service's ongoing failure to consult on the Forest Plans affecting the Mexican spotted owl was a violation of section 7 of the ESA, and,

unless the violation was corrected, suit would be brought to compel the Forest Service's compliance with the ESA. (Pl.'s Cross–Mot. at App. 259–60.) In support of its position that the Forest Service was in violation of the ESA, Earthlaw specifically cited both *Lane County* and *Pacific Rivers*. (Pl.'s Cross–Mot. at App. 259.)

Nevertheless, the Forest Service did not submit any of the LRMPs in Region 3 for consultation in response to the NOIS. Instead, as stated in a strategy memorandum dated January 31, 1994, Region 3 decided that it wanted to appeal the district court's ruling in *Pacific Rivers* to the Ninth Circuit on the grounds that pre-existing LRMPs are not "agency action" within the meaning of the ESA. (Pl.'s Cross–Mot. at App. 266–70.) The Forest Service, however, did not seek a stay of the decision. Although the Forest Service met with the FWS to work out a programmatic consultation, it continued to submit sample consultation packages that the FWS found insufficient to complete consultation and to issue a BO.[11]

The FWS position that Region 3's measures to protect the Mexican spotted owl were inadequate was made public in a Federal Register notice responding to a petition to remove the Mexican spotted owl from the ESA list of threatened species. *Endangered and Threatened Wildlife and Plants: 90–Day Finding on a Petition to Remove the Mexican Spotted Owl from the List of Endangered and Threatened Wildlife*, 59 Fed. Reg. 15,361 (Apr. 1, 1994).[12] In deciding not

11. At approximately the same time that the Forest Service was pursuing this legal strategy, on January 20, 1994, James R. Lloyd, Director of Wildlife and Fisheries Management for Region 3 of the Forest Service, confirmed the scheduling of a meeting on January 27, 1994, with the FWS to discuss the consultation process and "ways to implement a programmatic consultation." (Pl.'s Cross–Mot. at App. 265.) On February 28, 1994, the Forest Service and FWS held a meeting, the purpose of which was "to discuss the possibility of the Forest Service preparing a programmatic document for the FY94 Timber Sale program." (Pl.'s Cross–Mot. at App. 271–72.) However, the FWS expressed its view that sample consultation packages offered by the Forest Service were not sufficient for the FWS to complete consultation and issue a BO. (Pl.'s Cross–Mot. at App. 272.) The representative of the Forest Service in that

meeting did not agree with the FWS position on consultations. He reported that "... based on what I heard at the meeting today, I recommend that we continue submitting projects to USFWS for consultation in the same manner we have in the past." (Pl.'s Cross–Mot. at App. 272.)

12. The FWS decision stated in relevant part,

The listing petition pointed out that forest plans called for additional conversion of owl habitat from suitable to capable, which, added to ongoing conversion, would result in the likely extinction of the subspecies. The protection offered by Forest Service Region 3 Interim Directive Number 2 (ID No. 2) was not considered to be adequate. The [FWS] continues to believe, as do Forest Service researchers in the Northwest (Thomas *et al.* 1990) and California

to "de-list" the Mexican spotted owl, the FWS further emphasized the inadequacy of the Forest Plans by stating that "[t]he practice of even-aged management called for in Region 3 Forest Management Plans has resulted in owls disappearing from previously occupied territories without subsequent return. The Forest Service is currently revising its Forest Management Plans; however, the revised guidelines have not been formally adopted yet." *Id.* at 15,361–62.

On Thursday, July 7, 1994, the U.S. Court of Appeals for the Ninth Circuit affirmed the holding of the District Court in *Pacific Rivers*. The Ninth Circuit decided that LRMPs are comprehensive management plans governing a multitude of individual projects and as such represent ongoing "agency actions" for which the Forest Service is required to consult [13] under section 7 of the ESA whenever a new species is listed. Critically, the Ninth Circuit explicitly directed that the holding of *Lane County* that timber sales were "per se irreversible and irretrievable commitments of resources under section 7(d), and thus could not go forward during the consultation period," was applicable to LRMPs. *Pacific Rivers,* 30 F.3d at 1057 (*citing Lane County,* 958 F.2d at 295). The effect of this decision essentially meant that the Forest Service was required to submit for consultation those LRMPs which existed prior to the listing of the Mexican spotted owl and that, as irreversible and irretrievable commitments of resources, timber sales could not be performed during consultation.

The Forest Service was aware, at least as early as October 11, 1994, that *Pacific Rivers* was directly applicable to the LRMPs in Region 3. In response to an August 19, 1994, inquiry from Senator Dirk Kempthorne, the Chief of the Forest Service acknowledged that the Forest Service had submitted some of its LRMPs for consultation due to the *Pacific Rivers* decisions and specifically recognized the likely application of *Pacific Rivers* to the LRMPs in Region 3 as alleged by the suit pending in Region 3:

> Yes, the principles of the Ninth Circuit's *Pacific Rivers Council* decision would likely extend beyond the Snake River salmon. Other cases based on the Ninth Circuit's ruling have been filed, *Silver v. Thomas,* 94–1610 (D.Ariz.) (Mexican spotted owl).

(Pl.'s Cross–Mot. at App. 319–22.)

The Forest Service had earlier submitted 6 LRMPs from Regions 1 and 4 for consultation in addition to that of Region 6, which it submitted for consultation on September 9, 1994. *Pacific Rivers Council v. Thomas,* 873 F.Supp. 365, 368 (D.Idaho1995). However, the Forest Service did not submit any LRMPs from Region 3 for formal consultation with the FWS after the Ninth Circuit's decision in *Pacific Rivers*. (Pl.'s Cross–Mot. at 324–26.) According to an e-mail dated October 18, 1994, written by Patrick L. Jackson, Region 3 Special Assistant for Appeals, to Vince DeWitte, Staff Attorney, Land Management Planning & Environmental Law Section, Office of General Counsel, USDA, an ostensible reason for Region 3's opposition to submission of LRMPs was that it believed that the existing LRMPs themselves did not provide adequate protections for the Mexican spotted owl.[14]

Instead of submitting its Region 3 LRMPs for consultation and suspending the timber sale contracts at issue at this time, the Forest Service issued, in July 1994, a Draft

---

(Verner *et al.* 1992), that protection only of single territories as proposed in ID No. 2 would inevitably lead to the extinction of the habitat dependent species. Based on continued and projected destruction of habitat and inadequate regulation, the Service [FWS] determined that the Mexican spotted owl was likely to become an endangered species in the foreseeable future through all or a significant portion of its range.

*Id.* at 15,365 (emphasis added).

13. In this case, the Forest Service was required to consult with the National Marine Fisheries Service [NMFS] regarding the effects of LRMPs

on the Snake River Chinook salmon. 30 F.3d at 1051. The Forest Service's obligation to reinitiate formal consultation on Forest Plans with respect to newly listed species is the same with either NMFS or FWS.

14. The e-mail stated, in relevant part,

"[W]e are better served if we consult over the amendments that are currently being prepared. It makes no sense to consult over old Forest Plans which were the basic reason that the USFWS listed the MSO anyway."

(Pl.'s Cross–Mot. at App. 348.)

Environmental Impact Statement ("DEIS") which proposed to *amend* the Forest Plans in Region 3 to, among other things, provide management direction for the Mexican spotted owl.[15] (Pl.'s Cross–Mot. at App. 297–301.)

### 6. *Silver v. Thomas* Litigation

On August 8, 1994, several environmental groups filed suit in the United States District Court in Arizona ("Arizona district court") against multiple defendants, including Jack Thomas in his capacity as head of the Forest Service (*Silver v. Thomas* ) and Bruce Babbitt in his capacity as the Secretary of the Department of the Interior (*Silver v. Babbitt* ). The plaintiffs sought injunctive relief halting all timber harvesting activity in Region 3 of the Forest Service. (Def.'s Mot. at App. 3.) The plaintiffs alleged that the Forest Service's decision to harvest timber under existing LRMPs prior to completing formal consultation with the FWS on the effect of the listing of the Mexican spotted owl as a threatened species violated the ESA. (Def.'s Mot. at App. 13–15.)

Even after the *Silver v. Thomas* litigation was initiated, Region 3 and high ranking officials in the Washington Office of the Forest Service still opposed submitting its Forest Plans for consultation with the FWS even in the face of legal advice from the Department of Justice ("DOJ") to the contrary. In a memo dated November 3, 1994, the DOJ advised Region 3 of the Forest Service that *Pacific Rivers* applied directly to the *Silver v. Thomas* litigation and therefore "strongly recommended" that Region 3 "reinitiate consultation of current L[R]MPs and to complete ESA section 7(d) determinations on ongoing activities as soon as possible," (Pl.'s Cross–Mot. at App. 390) and further recommended that the Region settle *Silver v. Thomas* with the environmental plaintiffs. (Pl.'s Cross–Mot. at App. 394.) The DOJ went so far as to argue that the failure to follow *Pacific Rivers* in the *Silver v. Thomas* litigation could expose Department attorneys to sanctions for violating Rule 11 of the Federal Rules of Civil Procedure. *Id.*

However, instead of following the advice of the DOJ, Region 3 of the Forest Service sought Department of Agriculture intervention to "forestall the potentially serious negative effects on planning as the Forest Service has known it and on our ability to operate programs due to the Justice Department extension [sic] of the Ninth Circuit *Pacific Rivers Council* ruling to other lawsuits involving newly listed species." (Pl.'s Cross–Mot. at App. 393.) Specifically, the Forest Service wanted to seek a reversal of *Pacific Rivers* by the United States Supreme Court.[16] The memorandum went on to state that "without the Department's intervention, there could be gridlock in Region 3 and elsewhere." *Id.* The memorandum also shows that the Forest Service contemplated there was a significant chance that forestry activities would be suspended due to the litigation.

> Since the Region has some information on the [Mexican spotted owl] from its work on the Draft EIS, preliminary estimates indicate that the section 7(d) determinations on the [Mexican spotted owl] will not result in *major* shutdowns of Region 3 programs. However, we are advised that there is a high likelihood that the plaintiffs will dispute such a finding and that the court may

---

**15.** The reasons for amending the Forest Plans included the following:

> Existing forest plans emphasize use of even-aged timber management systems. Uneven-aged management is a permissible system in all existing plans but it is not emphasized and there is little guidance for its use. New information indicates even-aged management may conflict with habitat needs for northern goshawk and Mexican spotted owl. The existing forest plan management emphasis needs to be changed.

(Pl.'s Cross–Mot. at App. 299.)

**16.** The Forest Service recommended to the Department of Agriculture that:

> The obvious solution is to seek a reversal of the 9th Circuit *PRC* ruling by the U.S. Supreme Court. This could put a hold on all Forest Plan reconsultations including those in Region 3, pending review by the Supreme Court, if a stay of the Ninth Circuit's ruling were obtained.

(Pl.'s Cross–Mot. at App. 396.) Nonetheless, the Forest Service never sought a stay of the Ninth Circuit Ruling in *Pacific Rivers*.

enjoin some projects, as the Oregon court did.

(Pl.'s Cross–Mot. at App. 395.)

Accordingly, the Government filed its petition for Writ of Certiorari to the Supreme Court in *Thomas v. Pacific Rivers Council* in February 1995. (Pl.'s Cross–Mot. at 404–07.) The petition specifically advised the Court of the "broad ramifications" of the Ninth Circuit's decisions, including the pendency of *Silver v. Thomas* which sought to enjoin all ground-disturbing projects on 11 National Forests. (Pl.'s Cross–Mot. at App. 406–07.) This petition was denied by the Supreme Court on April 24, 1995. *Thomas v. Pacific Rivers Council,* 514 U.S. 1082, 115 S.Ct. 1793, 131 L.Ed.2d 721 (1995). The Ninth Circuit's decision was not stayed during the Supreme Court's consideration of the petition.

Despite the Supreme Court's decision, instead of submitting its existing Forest Plans for consultation, on May 15, 1995, the Forest Service issued a revised notice of intent to *amend* the Forest Plans by issuing a final EIS. *Southwestern Region: Arizona, New Mexico, West Texas, and Oklahoma Amendment of National Forest Plans in the Southwestern Region to Include Guidelines for Management of Habitat for the Mexican Spotted Owl and Northern Goshawk,* 60 Fed. Reg. 25,884 (May 15, 1995).

Then, on July 14, 1995, Region 3 sought to initiate formal consultation with the FWS on *amended* LRMPs in Region 3, but it did not submit any existing LRMPs in Region 3 for consultation. (Pl.'s Cross–Mot. at App. 426–27.) The Forest Service argued in its July 27, 1995, motion for summary judgment in *Silver v. Thomas* that consultations on the amended LRMPs would avoid the holding of *Pacific Rivers.*[17] However, the Arizona district court did not accept the Forest Service's argument. On August 24, 1995, the court entered judgment in favor of the plaintiffs and ordered that:

(1) The USFS shall immediately commence re-consultation on existing LRMPs in Region 3 in compliance with Section 7(a)(2) of the ESA and its relevant regulations to consider the listing of the Mexican Spotted Owl as threatened.

(2) Pursuant to Section 7(a)(2) of the ESA, the USFS shall defer or suspend all timber harvesting activities taken pursuant to the Region 3 LRMPs until the required consultation commences.

*Silver v. Babbitt,* 924 F.Supp. 976, 989 (D.Ariz.1995).

### C. Suspension of the Contracts at Issue

On August 25, 1995, pursuant to the Arizona district court's order, the Forest Service suspended all timber sale contracts in Region 3, including the Plaintiff's timber sale contracts. (Def.'s Mot. at App. 33.)

In the aftermath of the suspensions, the Forest Service was aware of the far-reaching impact of the suspensions on the timber industry. On August 28, 1995, the Forest Service prepared a document called "Summary Of Effects Of Injunction On Timber Harvest Activities On Region Three's Existing And Planned Timber Sales Program."

September, October and November are critical months for logging in the Southwestern Region. December through most of April is usually too wet and not cold enough to provide good winter logging conditions. Starting in February and going through August 31, much of the forest is closed down to logging due to restrictions for the nesting and fledgling season for Mexican spotted owls and northern goshawks. Thus, the importance of September to November in allowing timber operators to bring in enough logs to keep mills operating through the winter and through the restricted logging season.

A poll of Forest timber staff personnel indicates that about 40 to 50 percent of the total timber under contract at the present

---

17. The motion for summary judgment states in relevant part:

The issues of whether an LRMP ... is an "action" for purposes of the ESA that "may affect" the MSO need not be decided in this case because federal defendants already have reinitiated formal consultation on the potential effects on the MSO of all relevant LRMPs. Thus, federal defendants do not contest these issues for purposes of this litigation.

(Pl.'s Cross–Mot. at App. 431.)

time is restricted for Mexican spotted owl and northern goshawks. Thus, if this injunction continues for 2–3 months, it is essentially a 12 month delay for a very high percentage of our sales. It also means that many mills will have to shut down for extended periods. Since they have been operating "on the edge" for some time due to low availability of logs to process, this injunction could cause mills to close permanently.

(Pl.'s Cross–Mot. at App. 458.)

Shortly afterwards, on September 14, 1995, the Forest Service assessed the impact of the suspension on the timber industry in Region 3:

> The effect on the timber industry is very serious. Most timber projects have been delayed and/or modified as consultation on each project took place. Sawlog inventories in most mills is very low. The logging season is restricted in most places to fall months due to protective requirements for the owl and goshawks. Thus we expect to lose the 1995 year of production which will put several mills out of business permanently. There is a total of 52 major contracts with a volume of 103 million board feet that has been sold. Another 35 planned sales currently on hold include 61 million board feet. The [sic] represents about 1300 job [sic] or families that will lose some or all of their annual income with another 700 secondary jobs affected. Twelve communities in Arizona and 28 in New Mexico will feel the effects. We expect about three sawmills to go out of business permanently if the injunction lasts through this logging season.

(Pl.'s Cross–Mot. at App. 459.)

However, the Forest Service anticipated that consultations would be completed within 90 days. (Pl.'s Cross–Mot. at App. 496.)

On October 18, 1995, the Forest Service entered into a stipulation with the plaintiffs in *Silver v. Babbitt.* (Pl.'s Cross–Mot. at App. 465–73.) In this stipulation, the Forest Service agreed to complete the ongoing con-

sultation process with the FWS, not to appeal the Arizona district court's order, and to continue the suspension of timber harvesting activities already in place pursuant to the court's previous order with the exception of certain enumerated projects which could be released for harvest.[18] The Stipulation reads in relevant part:

> The Forest Service will suspend implementation or approval of all projects involving the cutting of trees in Region 3 until consultation on the existing LRMPs and the LRMPs as amended are complete (*i.e.,* when the Biological Opinions are issued)
>
> . . .

(Pl.'s Cross–Mot. at App. 466.) Further, the parties agreed that "upon entry of the judgment in this action the Court shall retain jurisdiction to ... enforce the provisions of this Order approving this Stipulation and the Judgment." (Pl.'s Cross–Mot. at App. 472–73.)

On October 18, 1995, the court approved the stipulation and issued an "Order Approving Stipulation Concerning Plaintiff's Claims Against United States Forest Service." (Pl.'s Cross–Mot. at App. 485–92.) Simultaneously, the court entered "Judgment Regarding Plaintiff's Claims Against The United States Forest Service." (Def.'s Mot. at App. 53–55.) In this judgment, the court ordered:

> that the Court retains jurisdiction to enforce the terms of its Order Approving Stipulation Concerning Plaintiff's Claims Against United States Forest Service, to enforce this judgment, to resolve the amount of fees and costs the Forest Service must pay to plaintiffs, and to resolve the plaintiff's claims against the United States Department of Indian Affairs.

(Def.'s Mot. at App. 53–54).

### D. Consultations on Existing LRMPs During the Period of Suspension

As stated above, the Arizona district court in *Silver v. Thomas* ordered reinitiation of formal consultations on August 24, 1995, but because the formal consultations became un-

---

**18.** The Plaintiff was authorized to begin timber harvesting on the Brann, Hutch–Boondock, and St. Joe timber sales. (Pl.'s Compl. ¶ 39.)

reasonably protracted in length, they were not completed until December 4, 1996. Logging operations, of course, were suspended during this time.

Initially, the Forest Service did not immediately commence formal consultations as it was ordered to do by the district court, but instead requested informal consultations while it gathered information. (Pl.'s Cross–Mot. at App. 502.) However, the Forest Service finally did initiate a request that the FWS engage in formal consultation on the existing LRMPs on September 6, 1995. (Pl.'s Cross–Mot. at App. 503.) To facilitate consultations, the ESA required that the Forest Service prepare a Biological Assessment "for the purpose of identifying any endangered species or threatened species which is likely to be affected by [agency action.]" 16 U.S.C. § 1536(c)(1). On September 22, 1995, the Forest Service prepared a Biological Assessment for the reinitiation of consultation with the FWS in which the Forest Service determined that the continued implementation of each of the existing Forest Plans in Region 3 "may affect the spotted owl and/or its critical habitat." (Pl.'s Cross–Mot. at App. 508.) On September 28, 1995, the Forest Service forwarded the Biological Assessment to the FWS. (Pl.'s Cross–Mot. at App. 509–10.) However, formal consultations did not actually commence until November 9, 1995, because the Forest Service had not included all necessary information in the initial Biological Assessment that it submitted. (Pl.'s Cross–Mot. at App. 512–13.)

On April 2, 1996, 205 days after the Forest Service requested consultations with the FWS, the Forest Service provided the environmental plaintiffs with two draft BOs prepared by the FWS, ostensibly one for existing LRMPs and one for amended LRMPs. (Def.'s Mot. at App. 56.) The next day, the Forest Service and the FWS issued a joint press release which explained that the draft BOs had determined that "... a hypothetical implementation of the *existing* forest plans would jeopardize the continued existence of the owl and adversely modify its critical habitat. However, since the Forest Service will be implementing the *existing* plans to follow the [FWS'] Mexican Spotted Owl Recovery Plan and consulting on site specific projects, the owl will not be jeopardized." (Pl.'s Cross–Mot. at App. 527.) The press release further explained that the final BOs would be ready in 30 days. *Id.*

However, on April 11, 1996, the environmental plaintiffs filed a motion with the Arizona district court requesting a ruling that the Forest Service had not completed consultation because no final BO had been issued and that the BOs themselves were legally insufficient.[19] (Def.'s Mot. at App. 57–74.) According to the environmental plaintiffs, the BO on existing LRMPs did not contain (a) jeopardy/no jeopardy findings; (b) findings on reasonable and prudent alternatives; or (c) an incidental takings statement.[20] (Pl.'s Cross–Mot. at 537.) Shortly after the filing of this motion, the Forest Service sent a letter to the FWS which "clarified" the scope of the consultation on the existing LRMPs. (Pl.'s Cross–Mot. at 530). This clarification stated that ongoing section 7 consultations

---

**19.** The implementing regulations of section 7 of the ESA provide that biological opinions shall include:

(1) A summary of the information on which the opinion is based;

(2) A detailed discussion of the effects of the action on listed species or critical habitat; and

(3) The [FWS'] opinion on whether the action is likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat ("a jeopardy biological opinion") or, the action is not likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat (a "no jeopardy opinion"). A "jeopardy" bi-

ological opinion shall include *reasonable and prudent alternatives*, if any. If the [FWS] is unable to develop such alternatives, it will indicate that to the best of its knowledge there are no reasonable and prudent alternatives.

50 C.F.R. § 402.14(h) (1995) (emphasis added).

**20.** "Incidental take refers to takings [of species] that result from, but are not the purpose of, carrying out an otherwise lawful activity by the Federal agency or applicant." 50 C.F.R. § 402.02. An incidental takings statement is required whenever the FWS finds that implementation of proposed action or reasonable and prudent alternatives will lead to a "take" of a protected species. 50 C.F.R. § 402.14(i).

would be cancelled and that the Forest Service would engage in limited consultations with the FWS on what it described as "the implementation of existing forest plans as described in the enclosed standards for management of [Mexican spotted owl] habitat pending amendment of forest plans." *Id.*

On May 3, 1996, the Arizona district court issued an order stating that the draft BOs issued on April 2, 1996, were not legally sufficient for all of the reasons proffered by the environmental plaintiffs. (Def.'s Mot. at App. 75–81.) The court stated, in response to the Forest Service's attempt to engage in limited consultations:

> Both of these actions are in direct violation of this court's order and the stipulations of the parties. This court has already clarified that consultation will not be complete until the FWS issues a proper biological opinion. In addition, this court has addressed at length the issue of whether the USFS must consult on the existing forest plans or only the amendments to those plans as argued by the defendants. In the order of August 24, 1995, this court considered the issue and concluded that the USFS must consult on existing forest plans and amendments. In addition, the parties stipulated to consultation on the existing forest plans in the subsequent October stipulation and order. The Court is at a loss to understand why the USFS would not carry out its duties set forth in the law, orders of this Court, and stipulation of the parties when failure to carry out those duties could result in contempt. The USFS may not evade its obligation to consult on existing forest plans and amendments to those plans by consulting on less than that stipulated by the parties and ordered by the Court. The USFS

must complete consultation as ordered by this Court on the existing forest plans— not just the amendments to those plans— before it may commence timber harvest that is not already proceeding by stipulation of the parties and order of the Court.

(Def.'s Mot. at App. 80.)

The court further stated:

> Unless the parties stipulate in writing promptly to the Court that another individual is responsible for the USFS, the Court will hold Mr. Thomas responsible for the USFS if it fails to carry out its duties under the ESA, regulations, stipulation of the parties and orders of this Court.

*Id.*

As a consequence of this ruling, the Forest Service continued its consultations with the FWS.

On July 12, 1996, the FWS issued to the Forest Service a final BO, in which it stated "that continued implementation of the existing forest plans will jeopardize the continued existence of the Mexican spotted owl and will adversely modify the species' critical habitat." (Pl.'s Cross–Mot. at App. 551.) In response, on the same day, the Forest Service sent a letter to the FWS, unilaterally asserting that the existing LRMPs were compliant with the BO and that the Forest Service had completed the consultations required by section 7 of the ESA and the Arizona district court's order.[21] (Pl.'s Cross–Mot. at App. 552.) Furthermore, the Forest Service filed the BO with the Arizona district court and informed the court that it was lifting the suspensions notwithstanding the court's explicit reservation of jurisdiction to enforce the terms of the joint stipulation.[22] (Pl.'s Cross–Mot. at App. 557.) The Forest Service also issued a press release announc-

---

21. The letter states in relevant part:

> [W]e have concluded that all biological effects on the Mexican spotted owl that could result from implementation of the Forest Plans have been addressed and that these Biological Opinions satisfy Section 7 requirements for programmatic consultation of Forest Plans.... We also believe that these consultations satisfy the court order and stipulation requiring a completed consultation on existing forest plans
> ....

(Pl.'s Cross–Mot. at App. 552.)

22. The filing states in relevant part:

> Pursuant to paragraph 6 of the Stipulation, issuance of the biological opinions on these consultations also lifts the suspension of tree-cutting activities in the Arizona and New Mexico National Forests. Since both biological opinions have now been finalized and the consultations completed, the tree-cutting suspension has lifted and the Forest Service plans to resume normal forest operations on Monday, July 15, 1996.

(Pl.'s Cross–Mot. at App. 557.)

ing that it would unilaterally "resume normal forest operations including tree-cutting on Monday, July 15, in the Southwestern Region .... This marks the end of a Court-ordered injunction that has been in effect since August 1995, over protection measures for the Mexican spotted owl." (Pl.'s Cross–Mot. at App. 554–55.)

However, in response to an emergency motion filed by the plaintiffs, the Arizona district court issued an order dated July 16, 1995, which stated that the Forest Service could not lift the suspensions until the court had ordered it to do so. (Pl.'s Cross–Mot. at App. 567.) The Arizona district court commented on the Forest Service's abortive attempt to resume timber sales in Region 3, as follows:

> [D]efendants were placed on notice that, if necessary, the Court intended to determine if consultation was complete and defendants were in compliance with the stipulation, the law and the orders of the Court. The Court is at a loss to understand why defendants would choose to proceed in this fashion in light of the Court's prior order advising defendants that the consultation would not be deemed to be complete until a "proper" biological opinion was issued under the requirements of the ESA and the applicable regulations. Instead, defendants have unilaterally determined that they have met all the requirements of the law, stipulation and orders of the court, and elected to proceed, even though the plaintiffs disagree, have raised the issue with the Court and the Court has had little to no opportunity to review the factual and legal issues. This is a highly unusual manner in which to proceed in this lawsuit or any lawsuit. *Rather than speeding up the resolution of this lawsuit, this situation again is being delayed by inappropriate procedures.*

(Pl.'s Cross–Mot. at App. 566–67) (emphasis added).

Moreover, the court stated:

> DEFENDANTS ARE HEREBY PUT ON NOTICE THAT THIS COURT CONSIDERS THE INJUNCTION STILL TO BE IN EFFECT UNTIL THE ISSUANCE OF FURTHER ORDERS OF THIS COURT.

(Pl.'s Cross–Mot. at App. 567) (capitalization in the original).

After holding a hearing with the parties on the issue of whether consultations were completed, the Court issued an order on July 25, 1996, in which it opined that the Forest Service was responsible for the delays in the completion of consultations:

> One year after the Court ordered the USFS to commence reconsultation and ten months after the stipulation to halt timber harvest activities, the issue of whether consultation is complete is before this Court. The USFS has taken ten months to reach this point.

> At a recent hearing, USFS mentioned the urgency of lifting the ban on timber activities and requested that the parties act quickly, noting that the timber industry and related jobs are stalled. *The Court is deeply concerned about the impact of this situation, but finds that the USFS is the culprit before the timber industry for the delays, not the Court.*

(Pl.'s Cross–Mot. at App. 581) (emphasis added).

On September 17, 1996, the Arizona district court formally held that the consultations were not completed upon the submission of the BOs. (Pl.'s Cross–Mot. at 583–84.) *Id.* The court specifically found that the BO on the existing LRMPs was still legally deficient in three of the four major required areas to be addressed in a Biological Opinion. *Id.* Accordingly, the court held that, "[u]ntil the consultation is completed by the submission of complete BOs, the injunction remains in effect." *Id.* However, the court also stated its belief that the remaining issues should be "addressed within weeks and the Biological Opinions resubmitted so that the stipulated injunction can lift as soon as possible." *Id.* The Forest Service did not appeal this ruling.

During this time the Forest Service was made aware that the facilities of the Plaintiff in this case had been shut down by the suspension, as the Plaintiff sent a letter to the Regional Forester to this effect. (Pl.'s

Cross–Mot. at 589.) On November 12, 1996, the court opined at a hearing that the consultation process was too slow and that third parties were being harmed by the continued delay:

> [Q]uite frankly, I don't think the manner in which the litigation is cast has appropriate incentives for the parties to resolve it and that third parties are being injured while the litigants really have not much at stake one way or the other and don't seem much—and don't seem to be working as diligently as they should to bring a resolution to it. And so the Court will try to find alternative methods of bringing appropriate pressure to bear on the parties if that's what needs to be done and to relieve pressure on those parties who are being injured by inaction by the parties to the litigation.

(Pl.'s Cross–Mot. at App. 595–96.)

The next day, notwithstanding the court's repeated findings that the parties, including the Forest Service in particular, were to blame for the delays in the litigation, the Forest Service filed an expedited motion to declare consultations to be complete by arguing, among other things, that "the current injunction has paralyzed the timber industry in Arizona and New Mexico" and stated further that "[s]imply put, the injunction has caused serious impacts to the communities that rely upon timber products in the Southwest. It is time to end the injunction." (Pl.'s Cross–Mot. at App. 599.)

On November 26, 1996, the Forest Service delivered a new final BO to the environmental plaintiffs. (Def.'s Mot. at App. 89.) On December 4, 1996, the court held that the BOs were legally sufficient and consultation had been completed. (Def.'s Mot. at App. 90–92.) In this order, the court stated, "the court further finds that the consultations are concluded and that the injunction against tree-cutting activities should be terminated." (Def.'s Mot. at App. 91.)

Subsequently, the Forest Service lifted the suspensions on the timber sales contracts. The Plaintiff alleges, however, that the lifting of the suspensions occurred after the close of the Normal Operating Season on all but one of the contracts and harvesting could not recommence until the spring of 1997. (Pl.'s Cross–Mot. at App. 614–15.)

### E. The Plaintiff's Submitted Claims

The Plaintiff submitted claims to the contracting officer claiming that the Forest Service was liable for the suspensions as follows:

| | Contract | Amount | Date |
|---|---|---|---|
| 1) | O.D. Ridge | $ 676,937.98 | November 19, 1997 |
| 2) | Kettle | $ 766,854.59 | November 19, 1997 |
| 3) | Hay | $3,258,138.42 | November 10, 1997 |
| 4) | Brookbank | $ 891,779.62 | November 17, 1997 |
| 5) | Jersey Horse | $ 371,664.50 | November 17, 1997 |
| 6) | Salt | $ 614,598.23 | November 17, 1997 |
| 7) | Manaco | $ 757,688.89 | November 17, 1997 |
| 8) | St. Joe | $1,135,725.75 | November 17, 1997 |
| 9) | Hutch–Boondock | $1,014,227.92 | August 15, 1997 |
| 10) | Mud | $1,223,558.07 | August 15, 1997 |
| 11) | Saginaw–Kennedy | $ 576,767.83 | August 15, 1997 |
| 12) | Brann | $ 568,243.49 | October 15, 1997 |
| 13) | U–Bar | $ 853,854.44 | August 15, 1997 |
| 14) | Monument | $ 387,169.89 | August 15, 1997 |

(Pl.'s Compl. ¶¶ 77, 78, 91, 92, 108, 109, 127, 128, 142, 143, 157, 158, 172, 173, 188, 189, 208, 209, 223, 224, 238, 239, 253, 254, 269, 270, 284, 285.)

In response to Precision Pine's claims, the contracting officer issued final decisions finding entitlement as follows:

| Contract | Amount | Date |
| --- | --- | --- |
| 1) O.D. Ridge | $1,776.41 | January 15, 1998 |
| 2) Kettle | $1,850.87 | March 16, 1998 |
| 3) Hay | $ 0.00 | January 15, 1997 |
| 4) Brookbank | $2,627.78 | March 16, 1998 |
| 5) Jersey Horse | $1,661.01 | March 16, 1998 |
| 6) Salt | $1,372.51 | March 16, 1998 |
| 7) Manaco | $ 663.31 | March 16, 1998 |
| 8) St. Joe | $ 0.00 | March 16, 1998 |
| 9) Hutch–Boondock | $ 131.23 | December 1, 1997 |
| 10) Mud | $ 926.61 | December 1, 1997 |
| 11) Saginaw–Kennedy | $ 357.22 | November 28, 1997 |
| 12) Brann | $ 44.62 | November 28, 1997 |
| 13) U–Bar | $6,553.66 | December 1, 1997 |
| 14) Monument | $ 277.55 | December 1, 1997 |

(Pl.'s Compl. ¶¶ 80, 94, 111, 130, 145, 160, 175, 191, 211, 226, 241, 256, 272, 287.)

## II. Motion to Dismiss

### A. Standard

The Court of Federal Claims is a court of limited jurisdiction. *United States v. King,* 395 U.S. 1, 3, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969); *American Maritime Trans., Inc. v. United States,* 870 F.2d 1559, 1563 (Fed.Cir. 1989). Absent congressional consent to entertain a claim against the United States, this court lacks authority to grant relief. *United States v. Testan,* 424 U.S. 392, 397–98, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). This court is statutorily precluded from possessing subject matter jurisdiction to hear claims in tort. *See* 28 U.S.C. § 1491(a)(1) ("the United States Court of Federal Claims shall have jurisdiction ... in cases not sounding in tort").

"[I]n passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *accord Hamlet v. United States,* 873 F.2d 1414, 1416 (Fed.Cir.1989). However, it is the plaintiff's burden to plead and to prove the requisite jurisdictional facts to establish the court's jurisdiction. *Kokkonen v. Guardian Life Insurance Company of America,* 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994). In rendering a decision, the court must presume that the undisputed factual allegations included in the complaint by a plaintiff are true. *Miree v. DeKalb County,* 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977); *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d 746, 747 (Fed. Cir.1988).

### B. The Plaintiff's Complaint Does Not Sound in Tort and States a Claim for Which Relief Can Be Granted.

The Defendant argues that the complaint should be dismissed for lack of subject matter jurisdiction and failure to state a claim. Since both arguments are related and the Court rejects both of them for similar reasons, they will be discussed together. First, the Defendant argues that the essence of the Plaintiff's complaint is that the Forest Service failed in its duty to correctly implement the mandates of the ESA in Region 3, because the Forest Service is obliged to comply with the mandates of the ESA as part of its official duties.[23] Thus it argues that the Plaintiff's claim sounds in tort, requiring its dismissal for lack of jurisdiction.[24] Second, the Defendant's counsel, at oral argument,

---

23. *Sierra Club v. Babbitt,* 65 F.3d 1502, 1504–05 (9th Cir.1995) ("section 7(a)(2) of the ESA imposes a procedural duty on Federal agencies to consult with the [FWS] before engaging in a discretionary action which may affect a particular species").

24. The Defendant, at oral argument, appeared to withdraw its claim that the Plaintiff's complaint sounds in tort, but the withdrawal was in itself somewhat ambiguous. (Tr. at 13–14.) However, because the Court is required to dismiss the action "[w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter" under RCFC 12(h)(3), the issue will nevertheless be decided by the Court.

(for the first time) argued that the action should be dismissed for failure to state a claim on the grounds that the contract did not explicitly incorporate a duty to abide by the terms of the ESA and its implementing regulations. It cited a string of cases for the proposition that a contractor cannot bring suit against the Government for violation of a statute or regulation unless the regulation exists for the benefit of the contractor: *Freightliner Corporation v. Caldera,* 225 F.3d 1361, 1365 (Fed.Cir.2000); *Cessna Aircraft Co. v. Dalton,* 126 F.3d 1442, 1451–52 (Fed.Cir.1997); *Rough Diamond Co. v. United States,* 173 Ct.Cl. 15, 351 F.2d 636 (1965). Clearly, section 7 of the ESA, which required the Forest Service to consult with the Fish and Wildlife Service for its existing LRMPs, does not exist for the benefit of the Plaintiff, but instead is designed to preserve the ecosystems upon which endangered species and threatened species depend and to achieve the purposes of various international treaties. 16 U.S.C. § 1531(b).

Nevertheless, the Court finds the Plaintiff's arguments against dismissal to be convincing. Its arguments are summarized and evaluated below. The Plaintiff claims that the Forest Service's suspension or delay of the contracts during the course of the *Silver v. Thomas* litigation and misrepresentations contained within the contract concerning the protective measures required by the ESA breached its implied obligations to cooperate and not to hinder the performance of the contracts. The Plaintiff makes two essential arguments for these claims. First, it claims that Clause CT 6.25 (7/86), included in all 14 contracts at issue, warranted that the Forest Service had identified the measures that were necessary for the protection of species under the ESA including the Mexican spotted owl and had included those measures in the contract. Clause CT 6.25 states in relevant part:

> Location of areas needing special measures for protection of plants or animals listed as threatened or endangered under the Endangered Species Act of 1973 and R–3 Sensitive Plant and Animal Species List are shown on Sale Area Map and identified on the ground. Measures needed to protect such areas have been included else-

where in this sentence or are as follows ....

(Def.'s Mot. at App. 2.) However, according to the Plaintiff, the Forest Service had not included all of the information necessary for it to make the representations that it included in its disclosures of special measures for protection of threatened species because it did not comply with its legal obligations under the ESA to consult with the FWS and to incorporate any existing results from the consultations into CT 6.25. Because the Forest Service had failed to consult with the FWS, so the Plaintiff argues, the warranties were misleading and the subsequent suspensions to correct the misrepresentations contained in the warranties were a breach of the express warranties contained within CT 6.25. Second, it argues that it is well-established that implied obligations exist in every government contract, including those of the implied duties to cooperate and not to hinder the performance of the other party, and that the delays imposed by the Forest Service when the contracts were suspended were unreasonable and breached these implied duties.

The Defendant relies on *Sunrise Village Mobile Home Park, L.C. v. United States,* 42 Fed.Cl. 392, 405 (1998), for the proposition that if a claim for money damages could be construed to arise from wrongful or negligent conduct of the Government in the course of discharging its official duties, then the claim sounds in tort. However, the precedent in this Circuit clearly demonstrates that such a proposition is overstated. For instance, the Tucker Act has been interpreted to hear tortious breaches of contract that are connected by some nexus with a breach of a substantive contractual obligation. *Olin Jones Sand Co. v. United States,* 225 Ct.Cl. 741, 745 (1980) ("Insofar as plaintiff's references to defendant's alleged misrepresentations are merely another way of asserting that a breach of contract had occurred, the ... claim is not barred simply because it might also be stated as a tort.") *See also D.F.K. Construction Corp. v. United States,* 45 Fed.Cl. 280, 284–85 (1999); (an allegation that the Government misrepresented weather conditions at construction site is

a valid contract claim) *C.B.C. Enterprises v. United States,* 24 Cl.Ct. 1, 5 (1991); *Summit Contractors, Inc. v. United States,* 22 Cl.Ct. 54, 56–57 (1990). Consequently, a misrepresentation claim, which the Plaintiff seeks in this case, is a tortious breach of contract claim that can be heard by this Court. *Summit Timber Co. v. United States,* 230 Ct.Cl. 434, 677 F.2d 852, 856 (1982); *Chris Berg, Inc. v. United States,* 186 Ct.Cl. 389, 404 F.2d 364 (1968). The representations or alleged warranties contained within clause CT 6.25 provide the basis for a sufficient nexus between the wrongful act and the contract that is necessary for the Court to have jurisdiction over this claim.

■ Furthermore, there can be little doubt that the implied duties to cooperate and not to hinder are read into contracts with the Federal Government and are binding on the parties as if they were expressly written into the contract. *Cedar Lumber, Inc. v. United States,* 5 Cl.Ct. 539, 549 (1984); *Kehm Corp. v. United States,* 119 Ct.Cl. 454, 469, 93 F.Supp. 620 (1950); *George A. Fuller Co. v. United States,* 108 Ct.Cl. 70, 96, 69 F.Supp. 409 (1947) (Government is liable for delays caused by it even in the absence of an express contractual provision.) *See also* Restatement (Second) of Contracts § 205. Almost any conceivable claim for breach of an implied duty to cooperate and not to hinder could be construed or characterized as a tort claim. If this Court had to dismiss any case for lack of subject-matter jurisdiction merely because the claim could be characterized as a tort, no contractor could ever bring an action for breach of an implied duty. A more sensible approach in determining whether a particular cause of action lies within the jurisdiction of this Court is to inquire into the nature of the substance of the claim itself as opposed to how the form of the cause of action could be characterized. *Hartle v. United States,* 18 Cl.Ct. 479, 482 n. 6 (1989); *Gregory Lumber Co. v. United States,* 9 Cl.Ct. 503, 525 (1986).

■ For the purposes of resolving whether this Court has jurisdiction in this case or whether the Plaintiff has stated a claim for which this Court may grant relief, it makes no real difference whether the Defendant characterizes its objections to the claims of the Plaintiff as a failure to incorporate into the subject contracts a statute which was enacted for the benefit of the contractor or that the claims more properly sound in tort rather than contract or (as will be explained *infra* § V(B)) that supposedly implied obligations of the Government predicated upon its statutory or regulatory obligations cannot lie when an express term dealing with the same subject matter is contained within the contract. All of the objections raised by the Defendant point towards essentially the same problem; namely, how to properly balance the protection of the reasonable expectations of contractors and the protection of the Government's right and duty to carry out its functions when a seeming breach of contract by the Government was caused by the (alleged) failure of the Government to comply with its statutory obligations. However, this Court cannot agree with the Defendant that this dilemma should be resolved by relieving the Government from contract liability in each and every case when the cause of a breach of contract is a failure of the Government to abide by its statutory or regulatory duties.

Instead, the Plaintiff correctly sees its claim through the lens of the implied duties to cooperate and not to hinder which exist in every contract. There are several reasons why the Plaintiff should be permitted to pursue its claim. First, the Plaintiff is not claiming that the Forest Service breached its implied duties merely by failing to abide by its statutory duties in some manner unconnected or unrelated to the performance of the contract. Rather, it alleges that the unreasonable failure of the Forest Service to engage in formal consultation as required by section 7 of the ESA, from the time of the listing of the Mexican spotted owl, caused the suspension of the contracts. (Pl.'s Compl. ¶ 11.) An allegation that the Government unreasonably caused a delay in the performance of a contract is a classic breach of implied duty action, albeit with the additional twist that the unreasonable delay caused by the Government's conduct had significance insofar as the conduct was contrary to its statutory duty. Thus, the Plaintiff is not,

strictly speaking, incorporating the provisions of the ESA into the contract nor does it need to incorporate the provisions of the ESA into the contract in order to bring an implied duty action in this instance.[25]

Second, with respect to its claim for breach of an express warranty, the Plaintiff does not appear to incorporate the ESA and the regulations into the contract either, as the Defendant characterizes the argument. Instead, the Plaintiff argues as follows, "Until the consultation on the Plans was complete, the Forest Service's representations in CT 6.25 that based on all information readily available at the time no further protective measures were required was [sic] simply not accurate. Thus, the misrepresentations, and the suspension that was necessary to correct them, breached Precision Pine's contracts." (Pl.'s Cross–Mot. at 11.) In this particular instance, the Plaintiff argues that the Forest Service could not have made the representations on reasonably reliable information because it did not and could not have known what additional measures were necessary, if indeed any further measures were necessary, because the Forest Service did not consult with the FWS as it was supposed to do.

Third, the Defendant states no precedent (and the Court has not been able to find any) that a contractor can never recover for any unreasonable delays in contract performance that are directly caused by an act (or failure to act) by the Government that is contrary to a statute or regulation under a claim for breach of an implied duty to cooperate and not to hinder. It is arguable from a policy standpoint, perhaps, that such a categorical exemption is necessary in order to prevent a flurry of claims against the Government in which creative litigants shoe-horn claims for violation of statutory duties, of dubious relation to a contract, into a breach of implied duty action. However, it would be odd that a breach of an implied duty claim against the Government could lie if the breach was caused by an act (or failure to act) that was legal, but the Government could escape contract liability if the breach were caused by an act (or failure to act) that was contrary to law. Moreover, there is no reason why this Court is not capable of using standard norms of contract interpretation and classic implied-contract theories to determine whether a claim for delay caused by an agency's course of action, contrary to law, is meritorious. Since there is apparently no precedent in this Circuit for such a categorical rule, the Court will find that the Plaintiff has stated a claim.

The Defendant is incorrect that *Smithson v. United States* [26] dictates that the Plaintiff's case sounds in tort. *Smithson* involved an allegation that FmHA regulations were incorporated into a loan agreement and that violation of the same regulations breached the agreement. However, the *Smithson* decision noted that there was no finding that the FmHA had engaged in arbitrary, capricious, or culpable conduct. *Smithson,* 847 F.2d at 794. Because the Plaintiff in this instance does allege that the failure of the Forest Service to consult was arbitrary and beyond the reasonable scope of actions contemplated by putative exculpatory provisions of the contracts (and because the Plaintiff does not and need not incorporate the ESA into the contract), the complaint is outside the scope of the holding of *Smithson.* Further, unlike *Somali Dev. Bank* [27] where the Court of Claims found that the plaintiff's claim that the Government breached a statutory duty owed to it sounded in tort, the Plaintiff in the present case does not allege that the Forest Service owed it a statutory duty to comply with the ESA. *Somali Dev. Bank,* 205 Ct.Cl. at 747, 508 F.2d 817. Instead, the Plaintiff claims that the Forest Service breached the contracts at issue by its unreasonable delay of the Plaintiff's performance of the contracts and that clause CT 6.25 which disclosed protective measures necessary to comply with the ESA was mislead-

---

**25.** Of particular significance in this case is that the key inquiry upon which this case turns is not whether the Forest Service violated section 7 of the ESA when it failed to submit its Forest Plans for consultation. The Arizona district court has already determined that the Forest Service did violate the law. Instead, this Court determines whether the government's failure to submit its Forest Plans for consultation was reasonable under the circumstances.

**26.** 847 F.2d 791 (Fed.Cir.1988).

**27.** 205 Ct.Cl. 741, 508 F.2d 817 (1974).

ing, both of which were caused by the Forest Service's failure to consult with the FWS as required by section 7 of the ESA.

Neither does *Smithson's* predecessor, *Nutt v. United States*,[28] provide any applicable rationale for the result which the Defendant seeks. *Nutt* observed the following:

> Since the Government can incur money damages in a contract action, the Government will be held to have obligated itself in contract only upon a showing of an express or implied-in-fact agreement to do so. This formidable standard serves to protect the fisc from all suits under contract claims except where the evidence guarantees that the Government has agreed to waive its sovereign immunity .... It also assures a necessary measure of flexibility to the Government in its daily operations so that it need not answer in damages for each false step or innocent legal error in administering the myriad of programs and functions that occupy its efforts.

> The distinction between these two sorts of actions and their respective remedies is essential to the proper balance between protecting the justifiable, bargained-for expectations of the public and the proper exercise of discretion necessary to the smooth and efficient operation of the Government. It is important that a mere reference in the contract to the controlling regulations not be converted into a contractual promise at the risk of subverting this crucial distinction.

*Nutt*, 12 Cl.Ct. at 350–51. However, at the heart of the dispute in the present case is whether the Forest Service reasonably administered the contracts at issue by suspending them. The issue of whether the Forest Service failed to submit its LRMPs as required by section 7 of the ESA in a timely fashion is directly tied into the Forest Service's administration of the contracts. Furthermore, there is no implicit sovereign immunity difficulty that worried the *Nutt* court in this case, because it is undisputed that the Tucker Act covers the implied duties to cooperate and not to hinder contracts.

Moreover, it would be inappropriate to apply, in this particular case, the line of precedent emanating from *Rough Diamond* which holds that a contractor cannot bring an action against the Government for its failure to abide by a statute that was not enacted for the contractor's benefit. Unlike in the case at bar, the contractors in *Rough Diamond* attempted to incorporate the duties of the statute into the contract. More importantly, none of these cases cited by the Defendant alleged a breach of an implied duty to cooperate and not to hinder the contracts. Instead, these cases involved claims for an equitable adjustment, *Freightliner*, 225 F.3d at 1364, an ineffective exercise of an option to extend a contract, *Cessna Aircraft Co.*, 126 F.3d at 1445–46; and a claim for damages from a barter in which the value of the goods exchanged related to an legally incorrect reference price. *Rough Diamond*, 173 Ct.Cl. at 17, 351 F.2d 636. The difference between these precedents and the case at bar is the role which the statute or regulation plays in the context of the case. The line of inquiry in the cited cases; namely, whether the statutes in question granted these contractors "litigable rights," *Id.* at 33, 351 F.2d 636, is not the relevant starting point in an allegation of a breach of an implied duty to cooperate and not to hinder. Instead, the key inquiry in an action for a breach of an implied duty action is whether the course of action (or non-action) taken by the Government unreasonably caused a delay in the performance of the contracts. *George A. Fuller Co.*, 108 Ct.Cl. at 96, 69 F.Supp. 409 (1947); *C.J. Betters Corp.*, 25 Cl.Ct. 674, 677 (1992) (*quoting Ozark Dam Constructors v. United States*, 130 Ct.Cl. 354, 127 F.Supp. 187 (1955)) ("The rule in this Circuit is that the efficacy of a limitation of liability clause does not extend to those situations where the breach, whether total or partial, arises out of the events within the Government's control."). In the present case, of course, the breach was allegedly caused by a failure to timely submit Forest Plans for consultation as required by section 7 of the ESA. The Court, again, sees no reason why it must divide allegations of a breach of an implied duty between those delays or misrepresenta-

---

**28.** 12 Cl.Ct. 345 (1987); *aff'd, Smithson v. United* *States*, 847 F.2d 791 (Fed.Cir.1988).

tions that are not caused by a statutory or regulatory violation, for which the Defendant would (presumably) allow this Court to grant relief, and those delays or misrepresentations caused by an act or omission that violates a statute or regulation, for which the Defendant would deny that this Court could grant relief.

Furthermore, it is significant that the Plaintiff's complaint does not say that the failure of the Forest Service to abide by its statutory duty to consult with the FWS breached the contract. Instead it claims that "the unauthorized and unreasonable suspension of the Contracts resulted in damages to Precision Pine." (Pl.'s Compl. ¶ 59.) The failure of the Forest Service to engage in consultations with the FWS was, in the words of the Plaintiff, the cause of the breach, but not the breach itself.[29] The occasion of the breach would naturally be the improper suspension of the contracts.

Construing the allegations in the complaint favorably towards the Plaintiff, the Court finds that the allegations are in fact contractual claims. Therefore, the Court finds that it does have subject matter jurisdiction over the contracts at issue and that the Plaintiff has stated a claim for which the Court has jurisdiction and for which relief can be granted.

Accordingly, the Court DENIES the Defendant's motion to dismiss the case for lack of subject matter jurisdiction or failure to state a claim. The Court now turns to the substantive issue of whether the Forest Service breached the contracts when it suspended them.

### III. Standard for Summary Judgment

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Jay v. Secretary, DHHS,* 998 F.2d 979 (Fed. Cir.1993). The party moving for summary

judgment bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). The court must resolve any doubts about factual issues in favor of the non-moving party, *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.,* 145 F.3d 1303, 1307 (Fed.Cir.1998), and draw all reasonable inferences in its favor. *See Gasser Chair Co. v. Infanti Chair Mfg. Corp.,* 60 F.3d 770, 773 (Fed.Cir.1995).

The fact that both parties have moved for summary judgment is not an admission that no material facts remain in issue. *Massey v. Del Laboratories, Inc.,* 118 F.3d 1568, 1573 (Fed.Cir.1997). *See also Prineville Sawmill Co. v. United States,* 859 F.2d 905, 911 (Fed. Cir.1988). Summary judgment will not necessarily be granted to one party or another simply because both parties have moved for summary judgment. *Corman v. United States,* 26 Cl.Ct. 1011, 1014 (1992). A cross-motion is a party's claim that it alone is entitled to summary judgment. *A Olympic Forwarder, Inc. v. United States,* 33 Fed.Cl. 514, 518 (1995). It therefore does not follow that if one motion is rejected, the other is necessarily supported. *Bubble Room, Inc. v. United States,* 159 F.3d 553, 561 (Fed.Cir. 1998). Rather, the court must evaluate each party's motion on its own merit and resolve all reasonable inferences against the party whose motion is under consideration. *Cincom Systems, Inc. v. United States,* 37 Fed. Cl. 663, 671 (1997).

The Court reviews decisions by a contract officer and allegations that a party did not fulfill its obligations under a contract on a *de novo* basis. 41 U.S.C. § 609(a)(3). *County of Suffolk, N.Y. v. United States,* 19 Cl.Ct. 295, 299 (1990).

### IV. The Forest Service Possessed Authority To Suspend Timber Contracts

■ The Defendant claims that clauses CT 6.01 and CT 6.25 specifically give the Forest Service the authority to suspend the contracts at issue. In determining whether

---

29. *See also* Pl.'s Reply in Support of its Cross Motion at 17 (". . . Precision is not arguing that the Forest Service's failure to comply with the ESA and its implementing regulations breached the contracts . . . . the matter squarely presented

by Precision for this Court to decide is whether or not the 16 month delay of Precision's operations violated the Forest Service's implied duty to cooperate and not to hinder Precision's operations.")

these clauses authorized the Forest Service to suspend contracts, "the primary objective of contract interpretation is to ascertain the intent of the parties at the time they entered the contract." *Ralden Partnership v. United States*, 891 F.2d 1575, 1578 (Fed.Cir.1989). The first step in ascertaining the intent of the parties is to look to the plain language of the contract. *Massie v. United States*, 166 F.3d 1184, 1189 (Fed.Cir.1999); *Gould v. United States*, 935 F.2d 1271 (Fed.Cir.1991). If the meaning of the plain language of the statute is clear, then there is no need to consider extrinsic evidence in determining the meaning of a term. *HRE v. United States*, 142 F.3d 1274, 1276 (Fed.Cir.1998).

There can be no doubt that clause CT 6.01, contained in all contracts at issue save the Hay timber sale contract, specifically authorizes unilateral suspension of the contracts in the event of a court order. Likewise, all contracts, including the Hay timber sale contract, contained clause CT 6.25, which implicitly grants the Forest Service the authority to unilaterally suspend the contracts at issue, since it provides that the Forest Service can cancel or modify the contracts and provide additional protection for endangered or threatened species. In light of the requirement of section 7 of the ESA not to make an "irreversible or irretrievable commitment of resources" during the period of consultation, any interpretation of clause CT 6.25 that would not permit a suspension during the consultation period would render the terms of the clause ineffectual for its designed purpose. *Scott Timber v. United States*, 40 Fed.Cl. 492, 502–03 (1998), *vacated on other grounds*, 44 Fed.Cl. 170 (1999). Although the Forest Service Manual contemplates a distinction between a suspension and a modification of a contract,[30] it is more sensible to read CT 6.25 as providing the Forest Service with the authority, within reason, to preserve the status quo in the forests, i.e., restraining any timber harvesting activities, until either consultations are complete and/or the Forest Service decides whether the contracts should

be cancelled, modified, or performed without change. *Id.*

■ While both clauses CT 6.01 and CT 6.25 provide the Forest Service with unilateral authority to suspend the contracts at issue, the clauses do not provide it with *unlimited* authority to suspend the contracts at issue, as shall be discussed below. If the Forest Service sought to exculpate itself from delays or misrepresentations caused by conduct within the Government's own control, there would need to be a clear expression of that intent in clauses CT 6.01 and CT 6.25. "It is not only reasonable, but it is required that where the government intends to exculpate itself from liability for its breach of contract, it must manifest that intent in direct and express language." *Dept. of Natural Resources and Conservation of Mont. v. U.S.*, 1 Cl.Ct. 727, 734 (1983); *see also Cedar Lumber, Inc. v. United States*, 5 Cl.Ct. 539, 552 (1984) ("when the government intends to disclaim liability for breach of contract, it must employ clear and express language to effectuate its intent"). However, nowhere in Clauses 6.01 and CT 6.25 is such language to be found.

Therefore, the Forest Service's right to suspend the contracts is subject to a rule of reasonableness. *Scott Timber*, 40 Fed.Cl. at 504. In order to determine whether the circumstances were reasonable, it is necessary to address in some detail the issue of how contractual clauses which provide express authority to suspend are to be interpreted in the light of the implied duties to cooperate and not to hinder the contracts.

## V. The Express Right to Suspend the Contracts is Interpreted in Light of the Implied Duties to Cooperate and Not to Hinder

### A. Standard for Finding a Breach of the Implied Duties to Cooperate and Not to Hinder

■ As stated above, there is no dispute that the implied duty to cooperate and the

---

**30.** With respect to modifications and suspensions of timber sale contracts, the Forest Service Manual states that "when unforeseen conditions arise after the contract approval, the Contracting Officer may negotiate mutually agreeable modifications." *See* Forest Service Manual ("FSM") § 2453.22, Pl.'s Cross–Mot. at App. 74. The For-

est Service Manual also contemplates a suspension to be outside the scope of a modification. "Forest officers shall not unilaterally, suspend, delay, or otherwise discourage or impair operations on a contract being processed for environmental modification." *See* FSM § 2453.24, Pl.'s Cross–Mot. at 75.

implied duty not to hinder performance of contracts (both being subspecies of the implied duty of good faith) are present in all government contracts.[31] The Court, in determining whether the Government had breached its implied duty to cooperate and not to hinder, will use the standard set out in *Cedar Lumber, Inc.*, 5 Cl.Ct. at 549, 550 (1984). If the contract contains a specific warranty, a breach of that warranty breaches the implied duty to cooperate. *Id.* at 549 (*citing United States v. Howard P. Foley, Co.*, 329 U.S. 64, 107 Ct.Cl. 710, 67 S.Ct. 154, 91 L.Ed. 44 (1946)); and, even if there is no specific warranty, an unreasonable delay that is caused in some way by the Government can breach the implied duty not to hinder. *Id.* However, in order for a delay to give rise to a breach of the implied duty to cooperate, the contractor must satisfy two elements. First, the contractor must prove that the cause of the delay was the fault of the Government. *Id.* at 550 (*citing Koppers/Clough v. United States*, 201 Ct.Cl. 344, 363 (1973)); *L.L. Hall Construction Co. v. United States*, 177 Ct.Cl. 870, 879, 379 F.2d 559 (1966). Second, the delay must be of sufficient magnitude and the delay must be of a sufficient hindrance to the operations of the contractor to constitute a breach. *Id.* (*citing Lewis–Nicholson, Inc. v. United States*, 213 Ct.Cl. 192, 199, 550 F.2d 26 (1977)). Therefore, the Court must examine the "particular contract, its context and its surrounding circumstances." *Id.* (*quoting Commerce International Co. v. U.S.*, 167 Ct.Cl. 529, 536, 338 F.2d 81 (1964)). A minor delay does not constitute a breach of the implied duty to cooperate.[32] *Id.*

## B. The Right to Suspend Is Qualified by the Implied Duty Not to Hinder

▇ As the Court decided above, clause CT 6.01 of the 13 non-Hay contracts gives the Forest Service the right to suspend the contracts to comply with a court order that is issued by a court of competent jurisdiction. *See supra*, § V. Likewise, clause CT 6.25, contained in all 14 contracts at issue, gives the Forest Service implicit authority to suspend the contracts. *Id.* This right to suspend, however, is not only qualified by its own terms, but also by implied duties. The Government could not suspend if, or to the degree that, the suspension was due to a breach of the implied duty to cooperate and not to hinder the contracts. Barring an exculpatory clause which clearly and expressly states otherwise, this Circuit has consistently held that delays caused by the Government breach the duty not to hinder the contracts. *James Stewart & Co. v. United States*, 105 Ct.Cl. 284, 328, 63 F.Supp. 653 (1946). *See also C.J. Betters v. United States*, 25 Cl.Ct. 674, 677 (1992) ("The rule in this Circuit, then, is that the efficacy of a limitation on liability clause does not extend to those situations where the breach, whether total or partial, arises out of events within the Government's control."). Thus, in this section the Court analyzes the Defendant's exercise of the right to suspend in light of the implied duty not to hinder.

In determining whether the Defendant breached the implied duty not to hinder, the Court is neither varying a term of the contract by extrinsic evidence, nor reading any terms out of the contract, as the Defendant contends. Instead, the Court is interpreting clauses CT 6.01 and CT 6.25 in light of

---

**31.** The implied duties to cooperate and not to hinder are two separate, albeit related, implied duties. *Walter Dawgie Ski Corporation v. United States*, 30 Fed.Cl. 115, 130 (1993). If the Government takes an action that is wrongful or otherwise engages in "active interference," it will be held to have breached the implied duty not to hinder the performance of the contracts. If the Government fails to take essential action, or when the Government's conduct during contract performance is unreasonable such as failing to help in a solution of a problem that has arisen in contract performance, it will be said to have breached its implied duty to cooperate with the performance of the contract. *See* Cibinic & Nash, Administration of Government Contracts 297 (3d Ed.1995).

**32.** In addition, *Cedar Lumber* teaches that in order to recover, the Plaintiff must show that delays caused material damage. *Id.* (*citing Commerce International*, 167 Ct.Cl. at 542, 338 F.2d 81.) However, it is not necessary to prove material damage in order to establish liability for breach of the implied duty not to hinder. The extent to which the Plaintiff suffered material damage as a result of the breach of the implied duty not to hinder shall be determined later during the damages phase of this case.

another term of the contract, namely, the implied term that creates the duty not to hinder. In doing so it is following the accepted canon of construction that a court ought to construe contract clauses harmoniously with one another. *McAbee Const., Inc. v. United States,* 97 F.3d 1431, 1435 (Fed.Cir. 1996) ("We must interpret the contract in a manner that gives meaning to all of its provisions and makes sense.").

The Defendant appears to argue that the Court cannot hold that the Forest Service's failure to comply with the ESA resulted in unreasonable delay such that it breached the implied duty not to hinder, unless the contract contains a specific provision that binds the Forest Service to comply with the ESA. (Def.'s Mot. at 24–25.) But it is difficult to see, logically, why it should matter whether the unreasonable delay was caused by failure to comply with a statute or for any other reason—what matters is whether the delay was unreasonable. Furthermore, the cases cited for this proposition by the Defendant in its brief do not support it. As stated earlier in § II(b), *supra,* the Plaintiff is not alleging that there is an implied duty to comply with the ESA as such. Instead, in this instance, it is alleging that the unreasonable failure of the Forest Service to submit its LRMPs to the FWS for consultation under section 7 of the ESA resulted in a wrongful suspension that constituted a breach of the implied duty not to hinder.

The Defendant cites the Court of Federal Claims case of *State of Alaska v. United States,* 35 Fed.Cl. 685 (1996) in support of the argument that Government liability must hinge on an express obligation to comply with a statute. That case is not binding precedent on this Court, and it is not really on point, since it did not concern the precise issue in this case, that is, unreasonable delay caused by a failure to comply with an applicable statute that results in a breach of the implied duty not to hinder. It merits some attention, however, because it did concern the more general issue of the interpretation of a contact provision in light of the implied duty of good faith and fair dealing.

Specifically, the case concerned an attempt by Alaska to bootstrap a provision of the Alaska Statehood Act (which the court found to be binding in contract), which provided that the state could share in the revenue from mineral exploitation of federal lands, into an obligation to open up specific federal lands for mineral development. This Court has no quarrel with the holding in *Alaska* that the implied duty (of good faith and fair dealing in that case) could not be stretched that far. However, in arriving at its decision, the *Alaska* district court opined:

> The implied obligation of good faith and fair dealing must attach to a specific substantive obligation, mutually assented to by the parties. In the present case, however, Alaska would have the implied duty of good faith and fair dealing create by implication an express [sic] obligation to open up specific federal lands to generate additional revenue for the State.

*Id.* at 704. The Defendant focuses on the first sentence of this quotation in support of its proposition that "there cannot be a breach of an implied duty absent a specific contractual obligation which incorporates the requirements of the ESA into Precision Pine's timber sale contracts." (Def.'s Mot. at 24.)

But it is difficult to understand what the court meant. The revenue-sharing provision seems to be a substantive obligation (the obligation to share revenue) mutually assented to by the parties; therefore, the first sentence does not seem to support the court's conclusion. Furthermore, it seems odd that Alaska would attempt to find an *express* obligation by means of an *implied* duty. Rather, as the *Alaska* district court stated earlier, Alaska was asking the court to determine "if the revenue sharing provision [of the statute] carried with it an implied duty to develop and manage Federal mineral lands in such a way as to maximize the amount of revenue Alaska would receive." *Id.*

The court's statement, in the indented paragraph above, does not provide a very helpful rule in determining the limits of the implied duty. *Any* obligation imposed by the implied duty of good faith and fair dealing could be characterized as creating by implication an obligation that is not found expressly in the contract. Perhaps what the

court meant was that Alaska was attempting to create a new independent promise rather than allowing the implied duty to merely monitor the performance of an existing promise. If so, the case at bar can be distinguished from *Alaska* because in *Precision Pine* the implied duty not to hinder functions as a monitor of the manner in which the existing right to suspend may be exercised; it does not create a new independent promise.

This Court believes that it is impossible to formulate rigid rules as to which provisions of a government contract the implied duty is to apply or as to the scope of the implied duties. Instead, it agrees with Professor Van Alstyne, who wrote: "The precise interaction of the duty of good faith with express contract language ... remains an important jurisprudential mystery." Michael P. Van Alstine, *Of Textualism, Party Autonomy, and Good Faith*, 40 Wm. & Mary L.Rev. 1223, 1227 (1999). As such, the scope of the implied duty must be resolved on a case-by-case basis. The implied duty to cooperate and not to hinder (or the implied duty of good faith and fair dealing) allows a court to monitor how a promise is performed or right exercised so that it is consistent with the ordinary expectations of parties to such a contract, objectively judged. 3 *Corbin on Contracts*, § 570(A) (Supp.2000) ("What courts are doing here [in recognizing implied duties] ... is but a recognition that the parties occasionally have understandings or expectations that were so fundamental that they did not need to negotiated about these expectations"); *Restatement (Second) of Contracts*, § 205 cmt. a ("Good faith performance ... emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party."). In *Alaska*, the plaintiff was attempting to change a promise to share revenue into a duty to maximize the revenue to

be shared. There was no allegation that the revenue that was received from federal mineral lands was improperly handled. The case at bar, by contrast, deals squarely with the *proper* exercise of the right to suspend.

In scrutinizing the proper exercise of the substantive right to suspend the contract, the Court does not maintain that the Government may not suspend pursuant to court order.[33] It does not read CT 6.01 or CT 6.25 out of the contract or make the provisions otherwise meaningless. One can imagine circumstances in which a suspension would not have occurred because of unreasonable delay. For example, a court could hold that the Forest Service could still suspend a timber sale contract pursuant to a court order whose purpose was to preserve the status quo before the Plaintiff engaged in operations without a finding that the Forest Service had violated a statute or regulation. *Scott Timber*, 44 Fed.Cl. at 172. Further, even if the Forest Service had violated a statute or regulation, this would not ipso facto mean that there was an unreasonable delay.[34]

Defendant cites *C.B.C. Enterprises* for the same proposition as it does *Alaska*, but its argument is still unavailing. In *C.B.C. Enterprises*, a contractor sued for a breach of the implied duty to cooperate and not to hinder because it incurred costs defending itself against a criminal investigation and debarment proceedings based upon unfounded allegations. The *C.B.C. Enterprises* court noted that the implied duty to cooperate and not to hinder could not be stretched that far. "Plainly, the Government has the right to initiate debarment proceedings and undertake investigations concerning labor law violations. A charge that the Government's conduct was grossly improper and unsupportable would insinuate the court into wholly independent administrative procedures, far beyond the contract at issue." *C.B.C.*

---

**33.** It is difficult to create an exact parallel between a case dealing with the exercise of a right and an affirmative promise. In the former, the person disadvantaged from the exercise would attempt to minimize the right; in the latter, the person benefitting from the promise would attempt to maximize it.

**34.** For example, a contractor could not recover for the Government's violation of a statute or regulation that is wholly unrelated to the performance of a contract. Moreover, a violation of a statute or a regulation might result in a delay, but the delay itself might not be of unreasonable duration. If, for example, the delays in this case lasted for only a few days, the delays could hardly be characterized as unreasonable.

*Enterprises, Inc.*, 24 Cl.Ct. at 5. In this case, however, the Court is not delving into wholly independent administrative issues, nor is it seeking relief for damages incurred outside the scope of a contract claim. The *C.B.C. Enterprises* court clearly contemplated the possibility that a plaintiff might allege a breach of an implied duty not to hinder because the hindrance was expressed " in contract terms, for instance . . . that delays resulted." *Id.* In the present case, the Plaintiff is clearly alleging a breach of an implied duty in contract terms; namely, that the unreasonable delays in the performance of the contracts were caused by the Forest Service's unreasonable exercise of its right to suspend under CT 6.25 and CT 6.01.

The Defendant's reliance on *Price v. United States*, 46 Fed.Cl. 640 (2000), is likewise misplaced. Following the *Alaska* holding, *Price* held that the government did not have an implied duty to inform a purchaser of a property that there were code violations and ongoing demolition proceedings on the property both before and after the purchaser signed the contract. *Id.* at 651. However, unlike the present case, the express provisions of the contract in *Price* explicitly disclaimed any warranty on the code violations and shifted the responsibility for satisfaction of code violations to the purchaser. *Price*, in effect, stands for little more than the proposition that the Government can, by an express term, disclaim all liability for acts or delays caused by the Government. *Wells Bros. Co. of N.Y. v. United States*, 254 U.S. 83, 86–87, 41 S.Ct. 34, 65 L.Ed. 148 (1920). However, clauses CT 6.25 and CT 6.01 do not expressly state that the Forest Service will not be held liable for any damages resulting from any delays caused by the Forest Service. Hence, *Price* is inapposite to the present case.

The Defendant argues further that a duty to consult cannot be implied because it would conflict with the Government's right to suspend, and courts are not permitted to find an implied term in a contract that conflicts with an express one. (Def.'s Mot. at 25.) Again,

this argument is incorrect. First, this Court is not implying a duty to consult as such. Instead, it holds that the delay was unreasonable under the circumstances of this case because it entailed failure to comply with a statute that required formal consultation. Second, insofar as the Defendant is arguing that the implied duty not to hinder is adding a new implied term, the answer is a simple one: The Court is not *adding* a new implied term to the contract nor is it reading any terms authorizing suspensions out of the contract. The Court is interpreting the right to suspend against the background of the implied duty not to hinder, which the Defendant admits is in all Government contracts. The cases and secondary authority that the Defendant cites—except for *Stafford v. United States*, 109 Ct.Cl. 479, 74 F.Supp. 155 (1947)—deal with *finding* a term by implication in a contract.[35] In such a case, it makes perfect sense that a court should not imply a term that conflicts with an express term. Again, this Court is not engaged in trying to see whether there is an implied duty not to hinder in this contract. Rather, it is applying the duty not to hinder, which is in every Government contract, to the Government's exercise of the right to suspend.

The *Stafford* case is relevant because it concerns a plaintiff who sought contract damages for delays in the face of an express contractual right of the Government to suspend performance of the contract. In that case, says the Defendant, the Court of Claims "refused to hold that the Government had breached an implied duty where the contractor suffered a delay when the Government exercised its contractual right to refuse to allow the contractor to proceed until the completion of another contract." (Def.'s Mot. at 27.) This may be, implicitly, the holding of the case, but the Defendant fails to point out that the Court rested its decision on the fact that the Government was not at fault in the delay: "There is no showing that the defendant's representatives were lacking in diligence in making the landscape work available . . . ." *Stafford*, 109 Ct.Cl. at 505, 74 F.Supp. 155. Later, the Court stated: "In

**35.** *ITT Federal Support Services, Inc. v. United States*, 209 Ct.Cl. 157, 168, 531 F.2d 522 (1976); *Chevron Chemical Corp. v. United States*, 5 Cl.Ct.

807, 811 (1984); 11 *Williston on the Law of Contracts* § 1295, at 34–35 (3d ed.1968).

the present case neither party was responsible for the substantial delay in the starting time for plaintiff's work which brought with it the added cost which plaintiff suffered." *Id.* at 505, 74 F.Supp. 155. Here, in contrast, the Plaintiff argues that the Forest Service is at fault in the delay. Therefore, the Defendant's reliance on *Stafford* is misplaced.

Next, in yet another variation on its theme that the Plaintiff is seeking to incorporate the ESA into the contract, the Defendant relies on *Scott Timber*, which, in turn, is based on *Smithson*. Of particular relevance is the following quote from *Scott Timber*:

> More importantly for purposes of this case, however, the Forest Service's obligation to complete the consultation process within 150 days arose, if at all, under section 7(b) of the ESA and not under the contracts at issue in this breach of contract case. Plaintiff has not identified any clause in the contract that could be construed to incorporate the ESA requirements into the contract. Therefore, the Court rejects any suggestion that the Forest Service's alleged failure to comply with the time period set forth in the ESA constitutes a breach of the contracts at issue in this case. *See Smithson v. United States*, 847 F.2d 791, 794–95 (Fed.Cir.1988) (rejecting contractor's argument that violation of government regulations evidenced breach of contract where contractor failed to adduce evidence that government regulation at issue formed an integral part of the contract).

*Scott Timber*, 40 Fed.Cl. at 505.

This Court believes that the *Scott Timber* Court's reliance on *Smithson* is misplaced when it is used to require that a statute must be incorporated in a contract in order to determine whether the failure to do an act, contrary to a statute, can in a particular instance cause a breach of an implied duty. *Smithson* does not discuss whether the regulations (of the Farmers Home Administration in that case) must be incorporated into the agreement; it assumes that they must be and holds that they were not. *Smithson*, 847 F.2d at 794. Furthermore, *Smithson* noted that it was not called upon to decide whether the act which supposedly violated a statute was unreasonable or wrongful. *Id.* Yet the unreasonableness of the failure to submit LRMPs for consultation with the FWS under section 7 of the ESA is an issue squarely before this Court to decide.

As a final assault on the implied duties, the Defendant tries to play clauses CT 6.25 and CT 6.01 off each other by claiming that CT 6.01 provides the Defendant with a far-reaching authority to suspend contracts pursuant to a court order that trumps the specific representations of CT 6.25. In other words, CT 6.01 provides such wide-ranging suspension authority pursuant to a court order that the Plaintiff cannot rely on any specific representation or warranty contained in CT 6.25 as a gauge of proper exercise of the right to suspend. It argues that any other result would read CT 6.01 out of the contract. This argument, however, is unavailing. The specific warranty contained in CT 6.25 limits the authority of the Forest Service to suspend contracts under CT 6.01. Under the terms of 6.01, the Forest Service may suspend pursuant to a court order "to prevent serious environmental degradation or resource damage that may require contract modification under CT 8.3 or termination pursuant to 8.2." However, the Forest Service may not reduce liability by means of CT 6.01 for suspensions that occurred as a result of the breach of an express warranty in CT 6.25. Thus, to the extent that the disclosures in CT 6.25 serve as a warranty, the Plaintiff was entitled to rely on the more specific representations contained in clauses CT 6.25 that necessary protective measures had been included in the contract and that CT 6.01 applied to matters outside the scope of the representations included in CT 6.25. *T. Brown Constructors, Inc. v. Pena*, 132 F.3d 724, 729 (Fed.Cir. 1997) (citing *Woodcrest Construction Co. v. United States*, 187 Ct.Cl. 249, 408 F.2d 406, 411 (Ct.Cl.1969)). Such a construction, contra the Defendant's arguments, does not read CT 6.01 out of the contract, but instead gives effect to both the terms of any express warranties contained in CT 6.25 and the reasonable exercise of suspensions contained in CT 6.01.

Thus, because there is no conflict between any express contractual provision and any

implied duties, the Court interprets the scope of an express contractual provision in light of an implied duty together in a harmonious and reasonable manner. At the outset, the interpretation of the express term should be construed strongly against the drafter, which is the Forest Service in this case. *D.F.K. Enterprises,* 45 Fed.Cl. at 289. If a contractor's interpretation of the contractual language falls within the zone of reasonableness, the contractor's interpretation prevails. *Interstate Gen. Gov't Contractors, Inc. v. Stone,* 980 F.2d 1433, 1434 (Fed.Cir.1992). However, even in the face of an unambiguous explicit term of a contract, implied duties remain in the background of the contract as a minimum and fundamental standard of conduct by which contracting parties must abide. 3 *Corbin on Contracts,* § 570(A) (Supp.2000) ("What courts are doing here [in recognizing implied duties] . . . is but a recognition that the parties occasionally have understandings or expectations that were so fundamental that they did not need to negotiate about these expectations.") The purpose of these standards is to protect the reasonable and fundamental expectations of the contracting parties. *Restatement (Second) of Contracts,* § 205 cmt. a ("Good faith performance . . . emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.") One such fundamental expectation, relevant here, is that when the performance of a contract remains in the control of a particular party, i.e., the Government, by means of an express term, the other party is protected from an unreasonable or arbitrary exercise of such control. *See Scott Timber Co. v. United States,* 40 Fed.Cl. at 502 ("It is a well-established principle of law that a party vested with contractual discretion must exercise his discretion reasonably and may not do so arbitrarily and capriciously") (*quoting Thomas Creek Lumber & Log Co. v. United States,* 32 Fed.Cl. 787, 790 (1995)). This fundamental expectation is analogous to findings that the standard FAR Suspension of Work clause limits the liability of the Government only to the extent that the delay is not unreasonable or where the Government is not the culprit for a delay. *Sergent Mechan-*

*ical Systems, Inc. v. United States,* 34 Fed. Cl. 505 (1995).

This case is remarkably similar to one heard by the Interior Board of Contract Appeals ("IBCA") which dealt with similar circumstances in which a government agency, by wrongfully delaying the performance of timber contracts by its own fault, breached the implied duty not to hinder. In *Superior Timber Co., Inc.,* IBCA No. 3459.97–1 BCA ¶ 30, 267, the Bureau of Land Management ("BLM") was held to have breached its implied duty not to hinder the contracts when it suspended the plaintiff's contracts. *Id.* at 143, 443. Like the present case at bar, the contracts at issue were suspended in order to comply with an injunction which required the BLM to consult with the FWS on the effects of its timber management sale program on the northern spotted owl. *Id.* at 143, 438. Because the failure of the BLM to consult with the FWS as required by law was unreasonable, the Government was deemed to have breached its implied duty not to hinder the contracts notwithstanding the contractual provision which gave the BLM the authority to suspend the contracts. *Id.* Although this case is not precedent, the Court finds its reasoning persuasive insofar as it holds that, even in the face of general suspension authority, the Government can be held liable for delays in timber contracts caused by its own unreasonable failure to submit Forest Plans and when such delays were entirely within the control of the Government.

Here, the Forest Service had control over the performance of the contracts by means of CT 6.01 and it was entitled to exercise such control provided that the reasonable expectations of the parties at the time of the contract were maintained. Although CT 6.01 permits the suspension of the 13 non-Hay contracts at issue, it is not reasonable to interpret that clause as to permit the suspension of the contracts when the Government unjustifiably and unreasonably failed to comply with its pre-existing duties that relate directly to the performance of the contracts at issue. Indeed, "an unreasonable delay attributable to the government may breach the obligation not to hinder the performance

of the other party." *Cedar Lumber*, 5 Cl.Ct. at 549.

Thus, if the failure of the Forest Service to consult with the FWS was the cause of a wrongful suspension, the suspension would constitute a breach of the implied duty not to hinder notwithstanding the express language of clause CT 6.01.

Similarly, another fundamental expectation of a contractor at the time of the bargain, relevant to this case, is that when the Government discloses certain restrictions placed on the performance of the contract and discloses that further restrictions on performance may be imposed in the future based on changed circumstances or more complete information, the Government had a reasonable basis for its disclosure. Such a fundamental expectation is analogous to the rule in which the Government's liability for a breach of warranty cannot be limited by clear exculpatory language when the breach arises out of events within the Government's control. *C.J. Betters v. United States*, 25 Cl.Ct. at 677 (1992). In this case, clause CT 6.25 contained in all 14 contracts at issue disclosed such restrictions on the performance of the contracts by stating "measures needed to protect [threatened or endangered species under the ESA in] such areas have been included elsewhere in this contract or are as follows.... " Thus, the Plaintiff had a fundamental expectation that the Forest Service had a reasonable basis for disclosing the special protective measures that were contained in clause CT 6.25. *Womack v. United States*, 182 Ct.Cl. 399, 389 F.2d 793 (1968). If the Forest Service did not have a reasonable basis for its disclosure, then the misrepresentations and the subsequent suspension of the contracts to correct the warranties would constitute a breach of the implied duty to cooperate, notwithstanding the suspension authority contained in CT 6.25. Specifically, because the LRMPs constituted "agency action," the Forest Service could not accurately represent that "measures needed to protect [threatened or endangered species under the ESA in] such areas have been included," since it had not consulted with the FWS as it was required to do by statute. This issue is discussed in more detail in the next section.

## VI. The Forest Service Breached its Implied Duty to Cooperate by Breaching an Express Warranty Contained in CT 6.25

### A. Clause CT 6.25 Contains an Express Warranty

■ At the outset, it must be established whether CT 6.25 contains an express warranty at all. Then the scope of any such warranty must be determined.

Clause CT 6.25 ostensibly permits the Forest Service to unilaterally cancel or modify the contracts at issue. It also permits the Forest Service to "provide additional protection," i.e., restrictions on the performance of the contracts, if "special measures for protection of plants or animals listed as threatened or endangered under the Endangered Species Act of 1973" listed in the contracts later "prove inadequate." The Plaintiff argues that this clause expressly warranted that the Forest Service had disclosed every needed protective measure that it knew or should have known at the time the contract was entered into and as more information became available. The Defendant, however, denies that clause CT 6.25 provided a warranty for several reasons. First, the plain language of clause CT 6.25 did not expressly warrant that the Forest Service had taken every required action to assure that the representations made were accurate because the words "all" or "the" were not included in the phrase "measures needed to protect such areas have been included elsewhere in this contract or are as follows," and that the contract expressly contemplated that additional measures could be imposed. Second, the clause itself placed the Plaintiff on notice that future restrictions may be placed on timber sales. Thus, the contracts contained no express warranty that suspensions would not occur in the future. *See Scott Timber*, 44 Fed.Cl. at 181. Third, it argues that its position is reasonable because courts regularly give great deference to the autonomy of parties to set contract terms and that such terms must be enforced. *See Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 848, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986) (contractual waiver of due process

rights are enforceable); *Hoskins Lumber Co. v. United States,* 89 F.3d 816 (Fed.Cir.1996). Finally, the Defendant argues that the position of Region 3 of the Forest Service on consultations was well known and easy for the Plaintiff to ascertain, and that the *Pacific Rivers* decision was certainly public knowledge. Therefore, the Plaintiff could not have relied on clause CT 6.25 as a far-reaching warranty without a reasonable investigation. *Collins v. United States,* 209 Ct.Cl. 413, 420–21, 532 F.2d 1344 (1976).

However, the Defendant's arguments do not avail. The Defendant's argument that lack of the words "all" or "the" in clause CT 6.25 negates any express representation fails because it is hypertechnical and is contrary to the natural reading of the text itself. The clause clearly states that such measures "have been included elsewhere in the contract or are as follows." The most straightforward reading of the clause would suggest to a contractor that the Forest Service had disclosed all protective measures required to comply with the ESA that it knew were necessary or should have known were necessary. Further, a contractor would assume that the Forest Service had a reasonable basis for its disclosures and would not reasonably believe it was assuming the risk that the Government might not have a reasonable basis for its disclosures. *Hollerbach v. United States,* 233 U.S. 165, 34 S.Ct. 553, 58 L.Ed. 898 (1914); *Everett Plywood & Door Corp. v. United States,* 190 Ct.Cl. 80, 419 F.2d 425 (1969); *Womack v. United States,* 182 Ct.Cl. 399, 389 F.2d 793 (1968). Moreover, the Defendant's argument that the Plaintiff had a duty to investigate whether the express warranty clauses had a reasonable basis is flawed. In order to recover on a breach of express warranty claim, the Plaintiff is not required to show that it relied on the warranty. *Hercules, Inc. v. United States,* 516 U.S. 417, 425, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996) ("When the government provides specifications directing how a contract is to be performed, the Government warrants that the contractor will be able to perform the contract satisfactorily if it follows the specifications.").

The Defendant's contention that its interpretation of the contract should prevail because courts generally uphold the autonomous rights of parties to contract rings hollow in the face of precedent in which the Government is liable for cases where a contractor cannot perform according to government-drafted specifications because the specifications themselves are defective. *United States v. Spearin,* 248 U.S. 132, 136, 54 Ct.Cl. 187, 39 S.Ct. 59, 63 L.Ed. 166 (1918); *Blount Bros. Corp. v. United States,* 872 F.2d 1003, 1007 (Fed.Cir.1989). Timber sale contracts are contracts of adhesion. *Seaboard Lumber Co. v. United States,* 41 Fed.Cl. 401, 408 (1998) (*citing Everett Plywood Corp. v. U.S.,* 227 Ct.Cl. 415, 651 F.2d 723, 730 (1981)). Further, exculpatory provisions are also construed "narrowly and strictly." *New Valley Corp. v. United States,* 119 F.3d 1576, 1584 (Fed. Cir.1997). Because exculpatory clauses are to be narrowly construed, this Court has refrained from enforcing a limitation of liability clause when the circumstances surrounding the breach are within the Government's control. "The rule in this Circuit is that the efficacy of a limitation of liability clause does not extend to those situations where the breach, whether total or partial, arises out of the events within the Government's control." *C.J. Betters Corp.,* 25 Cl. Ct. at 677 (*quoting Ozark Dam Constructors v. United States,* 130 Ct.Cl. 354, 127 F.Supp. 187 (1955)). Thus, the government is liable for damages attributable to misstatements of material fact in the contract. *D.F.K. Enterprises v. United States,* 45 Fed.Cl. 280, 287 (1999) ("contract terms susceptible to a misleading reading or implication subject the government to liability when a contractor misled by the term suffers injury.").

Consequently, the Court determines that the natural reading of clause CT 6.25 warrants that, at the time the contracts were entered into, the Forest Service had identified special measures necessary to protect species under the ESA, that it identified these measures based on analysis of reasonably available information, and that, based on the information reasonably available, the special measures disclosed were adequate for

the protection of endangered or threatened species.[36] However, the express warranty contained in CT 6.25 is a narrow one. CT 6.25 only warrants the Plaintiff that additional protection would only be imposed if measures proved inadequate due to causes that could not have reasonably been known or discovered *at the time the contract was entered into.* If, in this specific circumstance, the contracts are suspended in order to correct a misrepresented warranty, the Forest Service breached a specific warranty.

However, other than the narrow warranty described above, clause CT 6.25 does not generally warrant against the imposition of additional protective measures subsequent to the enactment of the contract, because it expressly contemplates that "[i]f protective measures prove inadequate ... or if new species are listed on the Endangered Species list," the Forest Service can cancel or modify the contract, or institute new protective measures. In particular the unambiguous clause, " 'regardless of when such facts become known' ... alludes to continued information gathering by the Forest Service and possible suspension of the sales." *Scott Timber,* 44 Fed.Cl. at 181.[37] The Plaintiff tries to distinguish *Scott Timber's* holding by claiming that it must be seen in the light of special legislation that affected Scott Timber's contracts,[38] but which is irrelevant to the present case. However, its argument is not persuasive because *Scott Timber's* holding also rests on an analysis of the language of clause CT 6.25 apart from any legislation.[39]

### B. Whether the Forest Service Breached its Express Warranty

The Plaintiff argues that the Forest Service violated its representation in CT 6.25

that it had identified special measures necessary to protect the Mexican spotted owl under the ESA, that it identified these measures based on analysis of reasonably available information, and that, based on the information reasonably available, the protective measures were adequate. These warranties are alleged to be untrue because the Forest Service had failed to meet its pre-existing obligations under section 7 of the ESA to consult with the FWS on the Mexican spotted owl, and therefore, it had no reasonable basis of knowing whether the special measures contained in clause CT 6.25 were adequate. However, as stated earlier, the Forest Service could, in accordance with the terms of CT 6.25, impose additional protective measures, including suspensions, in response to information that was not known or could not reasonably be ascertained. Therefore, it must first be determined whether the Forest Service had a reasonable basis for its position on consultations.

1. The Forest Service Had a Reasonable Basis for Failing to Consult with the FWS at the Time of the Listing of the Mexican Spotted Owl.

■ The Plaintiff argues that it was unreasonable for the Forest Service not to have submitted its existing LRMPs for consultation with the FWS when the Mexican spotted owl was listed as a threatened species on April 15, 1993, because on March 4, 1992, the Ninth Circuit had ruled in *Lane County* that programmatic management plans used to implement timber sales were "agency action" and, as such, a government agency was required to consult under section 7 of the ESA ·

---

36. The Defendant seems to have conceded this point by stating that, "[T]he plain language of the clause indicates that the clause was intended to place the purchaser on notice of any current restrictions on operations on the timber sale area and was not a warranty against the possibility of any future restrictions." (Def.'s Opp'n at 4.)

37. Clauses C6.25 and C6.01 in *Scott Timber* are almost identical to that of clauses CT 6.25 and CT 6.01 at issue in this case. The slight differences between the clauses are immaterial to any issue in either case. *See Scott Timber,* 40 Fed.Cl. at 500, 502.

38. "... the Forest Service identified no areas needing special protective measures in the contracts because Congress directed through Section 318 that no special measures were required." *Scott Timber,* 44 Fed.Cl. at 180 (1999).

39. Notwithstanding any warranty, an unreasonable suspension caused by the fault of the Government pursuant to CT 6.25 breaches the implied duty not to hinder the contracts at issue, as will be discussed below. *See infra,* § VII.

whenever a new species was listed that could be affected by activities conducted pursuant to the timber management plans. *Lane County*, 958 F.2d. at 293. In the wake of *Lane County* and the listing of the Mexican spotted owl, the Forest Service could have changed its position on submitting LRMPs for consultation with the FWS, but it did not. Instead, after *Lane County* was decided, the Forest Service attempted to avoid submitting its LRMPs by jerry-rigging a regulatory mechanism of (ultimately inadequate) conservation measures in Region 3 consisting of a series of nonbinding interim directives and environmental impact statements that it hoped would stave off listing of the Mexican spotted owl by the FWS. Once the Mexican spotted owl was listed, the Forest Service elected only to submit "iterations" of projects to the FWS for consultation (which the FWS itself maintained was not a "true" programmatic consultation on a region- or forest-wide basis),[40] rather than submitting the existing LRMPs themselves. The Plaintiff argues that, once the FWS listed the Mexican spotted owl as a threatened species, the Forest Service was obligated to submit its existing LRMPs plans for consultation.

However, at the time of the listing of the Mexican spotted owl, the Forest Service did in fact have a reasonable basis for believing that it did not need to submit its existing Region 3 LRMPs to the FWS for consultation. At issue in *Lane County* was a timber management plan that was enacted after the listing of a threatened species (the northern spotted owl). *Lane County*, 958 F.2d at 291. However, in Region 3, the LRMPs were completed between 1985 and 1988, several years before the Mexican spotted owl was listed. This left open the legal question of whether only amendments and revisions to existing LRMPs qualified as "agency action" within the meaning of the ESA, or whether pre-existing LRMPs also qualified as "agency action." However imprudent or risky its strategy of avoiding consultations on its existing LRMPs was, the Forest Service had a genuine legal argument that it did not have to submit these Forest Plans for consultation. It was not patently unreasonable, at

the time of the listing of the Mexican spotted owl, for the Forest Service to have failed to submit its pre-existing LRMPs for consultation with the FWS.

2. The Forest Service Did Not Have a Reasonable Basis for Failing to Consult with the FWS after the *Pacific Rivers* Decision.

 After the Oregon district court issued its ruling in *Pacific Rivers*, but before the decision was affirmed by the Ninth Circuit, the Forest Service had received a Notice of Intent to Sue from the environmental organization Earthlaw, on the grounds that its failure to submit pre-existing LRMPs for consultation with the FWS was in violation of section 7 of the ESA. In response, Regions 1 and 4 of the Forest Service submitted their LRMPs to the FWS for consultations, but Region 3 did not. Instead, the Forest Service, over the stated objections of the FWS, submitted "iterations" or groups of projects for consultations.

On July 7, 1994, the Ninth Circuit, in *Pacific Rivers*, held that LRMPs implemented prior to the listing of an endangered or threatened species were "agency action" for the purposes of the ESA, and therefore were required to be submitted for consultation with the FWS. *Pacific Rivers*, 30 F.3d at 1051–52. In the face of this clear ruling, a notice of an impending lawsuit which sought to force the Forest Service to submit its LRMPs in Region 3, and the actual submission of LRMPs by other regions of the Forest Service, Region 3 should have taken two actions. First, it should have submitted its pre-existing LRMPs for consultations with the FWS pursuant to 16 U.S.C. § 1536(a)(2). Second, to prevent "any irreversible and irretrievable commitment of resources," the Forest Service should have suspended all logging activities within Region 3 during the course of consultations as required by 16 U.S.C. § 1536(d). However, the Forest Service did not take these actions. Instead, Region 3 tried to avoid the clear mandate of *Pacific Rivers* by submitting *amendments* to the

**40.** The original LRMPs, it should be recalled, contained a biological assessment which stated

that, if a new species were listed, consultations on the LRMPs should be initiated.

LRMPs for consultation with the FWS. When the plaintiffs in *Silver v. Thomas* filed their complaint on August 8, 1994, demanding that Region 3 submit its LRMPs to the FWS for consultations, Region 3 still refused to comply with *Pacific Rivers* even though the Department of Justice itself maintained that *Pacific Rivers* was directly applicable to the *Silver v. Thomas* case and "strongly urge[d]" the Forest Service to submit plans for consultation and settle *Silver v. Thomas.*[41] Instead, the Forest Service recommended that the Department of Agriculture seek a reversal of *Pacific Rivers* in the U.S. Supreme Court and seek a stay of the *Pacific Rivers* ruling. However, at no time did the Government ever seek an injunction or stay of *Pacific Rivers* in the Ninth Circuit. Instead the Forest Service, in the face of clear controlling precedent to the contrary, still refused to consult with the FWS on the existing LRMPs even though *Pacific Rivers* was binding authority on Region 3.

Instead of settling the *Silver v. Thomas* case and submitting its LRMPs for consultation, Region 3 of the Forest Service continued its vain strategy of avoiding the holding of *Pacific Rivers* by preparing amendments to LRMPs and submitting only the amendments for consultation with the FWS. This strategy, predictably, was rejected by the Arizona district court, and the Forest Service was ordered to submit its LRMPs to the FWS and to suspend all timber contracts relating to the Region 3 LRMPs until the consultation commenced. Thus, the timber sales at issue were suspended the next day,

and formal commencement of consultations did not occur until November 9, 1995.

The evidence shows that the Forest Service's failure to engage in formal consultations with the FWS in Region 3, from the Ninth Circuit's decision in *Pacific Rivers* onwards, was unreasonable. The Defendant claims that the Forest Service's failure to initiate consultation on its LRMPs in Region 3 was excusable because "[t]he issue of whether the ESA applied to LRMPs was so complex that the Department of Justice petitioned the United States Supreme Court to resolve the issue." (Def.'s Opp'n at 21.) However, as demonstrated above, there was nothing complex about the issue itself. Nor does the filing of a petition for a writ of certiorari evidence reasonableness on the part of the Forest Service in the absence of a stay of the *Pacific Rivers* decision. It is implausible in this instance to say the Forest Service reasonably, but mistakenly, believed that it was entitled not to initiate consultations with the FWS upon the listing of the Mexican spotted owl, because the Chief of the Forest Service noted, in a letter to Senator Kempthorne, dated October 11, 1994, that *Pacific Rivers* was "likely applicable" beyond the facts of the decided case and referenced *Silver v. Thomas* as an illustrative example.

Thus, the Forest Service breached, with respect to those contracts entered into after the Ninth Circuit's decision in *Pacific Rivers* on July 7, 1994,[42] an express warranty contained within CT 6.25. Specifically, the Forest Service breached an express warranty that clause CT 6.25 of these contracts disclosed the protective measures which were

---

**41.** At oral argument, the Defendant claimed that legal advice provided to the Forest Service by Department of Justice attorneys was subject to the attorney-client privilege. (Tr. at 42–43.) This document, however, was included in the appendix of the Plaintiff's cross-motion for summary judgment. (Pl.'s Cross–Mot at App. 390). Moreover, the Plaintiff's counsel represented that it obtained this document from the Defendant in the course of discovery. (Tr. 43–44.) This document, in normal circumstances, would be covered by the attorney-client privilege. As a general rule in this Circuit, an inadvertent disclosure of a privileged document waives the privilege. *Carter v. Gibbs,* 909 F.2d 1450, 1451 (Fed.Cir. 1990). However, if a party proves that it did not intend to disclose the privileged documents and that, despite the disclosure, it took reasonable

steps under the circumstances to prevent the disclosure, the privilege is not waived. *National Helium Corp. v. United States,* 219 Ct.Cl. 612, 616 (1979). The Defendant has not offered any evidence that the document was inadvertently provided nor has it attempted to show that it took reasonable steps to prevent the disclosure. Because the Defendant has not attempted to satisfy the *National Helium* test, and its eleventh-hour objections are, in any event, untimely, the attorney-client privilege is deemed waived.

**42.** The following contracts were entered into after July 7, 1994: Mud, Monument, Saginaw–Kennedy, Brann, Manaco, Brookbank, and Kettle.

necessary to comply with the ESA by including misrepresentations in the warranty and suspending those contracts in order to correct the misrepresentation. The misrepresentation contained in the warranty was that the Forest Service had no reasonable basis to know whether its warranty was true, due to its unreasonable failure to submit its Region 3 LRMPs for consultation with the FWS and its unreasonable failure to suspend logging activities within Region 3 when the Forest Service knew it was required to do so after the Ninth Circuit decision in *Pacific Rivers*. Therefore, because the Forest Service breached an express warranty contained in those contracts, the Forest Service also breached its implied duty to cooperate with respect to those contracts entered into after July 7, 1994, the date of the Ninth Circuit's decision in *Pacific Rivers*.

## VII. The Forest Service Breached Its Implied Duty Not to Hinder 11 of the Contracts at Issue When It Suspended the Contracts at Issue

### A. The Forest Service Suspended the Contracts at Issue by Its Own Fault

As stated above, the Government may be held liable for a breach of an implied duty not to hinder the performance of a contract if the hindrance is caused by the fault of the Government. *Chalender v. United States,* 127 Ct.Cl. 557, 563, 119 F.Supp. 186 (1954); *James Stewart & Co.,* 105 Ct.Cl. at 328, 63 F.Supp. 653. This Court also determined that if the Forest Service unreasonably failed to submit its LRMPs with the FWS on a timely basis, then the 14 contracts at issue were breached, notwithstanding the purported right to suspend the contracts under clauses CT 6.01 and CT 6.25. Because the Court has already determined that the failure of the Forest Service to submit its LRMPs upon the Ninth Circuit's decision in *Pacific Rivers* until ordered to do so by the Arizona district court was unreasonable,[43] it holds that the Government is culpable for the suspension of the 14 contracts. However, in order to hold that the Forest Service breached the implied duty not to hinder, the Court must determine whether, in the surrounding circumstances of the contract, the length of the suspension was unreasonable.

### B. The Length of the Suspension of 11 of the 14 Contracts Was Unreasonable

Under the regulations implementing the ESA, formal consultations are to last no more that 90 days. 50 C.F.R. § 402.14(c) (2000). The Biological Opinion is to be issued by the FWS within 45 days. 50 C.F.R. § 402.14(e) (2000). Thus, had the suspensions been conducted according to the regulations, the suspension should have not lasted much more than 135 days. In fact, the suspensions lasted from August 25, 1995, until December 4, 1996, for a total of *467 days.* Notwithstanding the protracted length of the suspensions, the mere fact that the suspensions remained in effect far longer than provided for in the regulations does not in itself suggest that the length of the delay was unreasonable and was the fault of the Forest Service.

However, the Court finds that the length of the suspensions was unreasonable for 11 of the 14 contracts at issue and the Forest Service was at fault for the delay. First, on August 25, 1995, the Forest Service requested that the FWS engage in informal consultations on the existing LRMPs rather than engaging in formal consultations right away. The purpose of the informal consultation was purportedly to allow the Forest Service to gather information necessary for formal consultations. In fact, the Forest Service did not request formal consultations until September 6, 1995, and did not formally reinitiate consultations until November 9, 1995, due to the failure of the Forest Service to provide the FWS with all necessary information. While the delay is in itself inexplicable, it is particularly egregious because the Forest Service reasonably could have gathered the necessary information for consultation at any time between the Ninth Circuit's decision in *Pacific Rivers* and the district court's order in *Silver v. Thomas.* The 2–month delay between the district court's order and the initiation of formal consultations was unreasonable.

---

43. *See supra,* § VII(B)(2).

Second, the Forest Service further unreasonably delayed the completion of the consultation process by its failure to provide the environmental plaintiffs and the district court with a legally sufficient Biological Opinion in conformity with the joint stipulation of dismissal of the case on several occasions. On April 2, 1996, the Forest Service forwarded a draft Biological Opinion to the environmental plaintiffs, who in turn sought and obtained a ruling from the district court that the Biological Opinions did not meet the legal requirements of the ESA and that the Forest Service was not "carry[ing] out its duties set forth in the law, orders of this Court and stipulation of the parties . . . ." (Pl.'s Cross-Mot. at App. 539.) On July 12, 1996, the FWS issued a final Biological Opinion, which the Forest Service submitted to the district court unilaterally declaring that consultations and suspensions were at an end in blatant contradiction to the orders of the district court. As a consequence of the Forest Service's failure to abide by its orders, the district court noted that the Forest Service, "[r]ather than speeding up the resolution of this lawsuit," was causing instead its being "delayed by inappropriate procedures." (Pl.'s Cross-Mot. at App. 567.) On September 17, 1996, the district court ruled that the Biological Opinions were still legally deficient. It was not until November 26, 1996, that the Forest Service provided a set of final Biological Opinions which were accepted by the Court on December 4, 1996. These series of substantive and procedural blunders by the Forest Service exacerbated the already unreasonable delays in the completion of the consultations and the lifting of the suspensions on the contracts at issue.

Third, the Arizona district court, which was in the position to weigh the Forest Service's compliance with the stipulation of dismissal, opined that the Forest Service was not diligent in doing all that it could to lift the suspensions. "The Court is deeply concerned about the impact of this situation, but finds that the USFS is the culprit before the timber industry for the delays, not the Court." (Pl.'s Cross-Mot. at App. 581.) "[T]hird parties are being injured while the litigants really have not much at stake on way or the other and don't seem to much—

and don't seem to be working as diligently as they should to bring a resolution to it." (Pl.'s Cross-Mot. at App. 595.) The district court was in the position of weighing whether the Forest Service was the cause of unreasonable delays in bringing the consultations to a timely conclusion. The Arizona district court repeatedly concluded that the Forest Service unreasonably delayed the completion of consultations. This Court agrees with the conclusions of the district court.

██ However, the Court does not find that the length of the suspensions for the Brann, Hutch–Boondock, and St. Joe timber sale contracts were unreasonable. According to the order approving the joint stipulation between the environmental plaintiffs and the Forest Service in *Silver v. Thomas,* performance of timber sale contracts could proceed for those three contracts. (Pl's Cross-Mot. at 489.) The two-month suspension of these contracts, in light of the regulations which normally would prescribe consultations to be completed within 135 days, is reasonable.

Therefore, the Court finds that the length of the suspension was both unreasonable and the fault of the Forest Service with respect to all contracts at issue with the exception of the Brann, Hutch–Boondock, and St. Joe contracts.

C. The Plaintiff's Operations Were Significantly Hindered by the Delays

The Court finds that the Defendant was aware that the Plaintiff's operations would be significantly hindered by the delay. The Forest Service was aware of the effects of the suspension of the timber sales contracts on the timber industry as a whole within Region 3. It noted in a document prepared on August 28, 1995, days after the suspensions were announced, that the months of September through November were the peak logging months in Region 3 due to weather conditions during the winter and logging restrictions through most of the forests the rest of the year. Further, the Forest Service knew that if the suspension remained in place for those peak months, that many timber mills would have to be shut down temporarily or permanently. Thus, because the

**72**

suspensions lasted from August 1995 through December 1996, the Forest Service knew that the timber industry as a whole was deprived of 2 years' worth of timber sales. The Forest Service also received correspondence from the Plaintiff that it was suffering from economic harm from the ongoing suspensions, including mill shutdowns.

 To recap, the Court finds that, in light of the circumstances surrounding the contracts, the initial suspensions of 11 the 14 contracts were wrongfully caused by the Forest Service, and that the length of the suspensions was both unreasonable and wrongfully caused by the Forest Service, and that the Plaintiff's operations were significantly hindered. Therefore, the Court finds that the Forest Service breached its implied duty not to hinder the performance of all contracts at issue with the exception of the Brann, Hutch–Boondock, and St. Joe contracts.

## VIII. The Suspensions of the Contracts Were Not Sovereign Acts

 The Defendant argues that the suspensions of the contracts by the Forest Service in order to comply with the Arizona district court's order and section 7 of the ESA were sovereign acts which shield it from liability for any breach of the contracts at issue. The sovereign acts defense is an element of every Government contract, whether explicitly stated or not. *Walter Dawgie Ski Corp.*, 30 Fed.Cl. at 131 (1993), (*citing Hughes Communications Galaxy, Inc. v. United States*, 998 F.2d 953, 958 (Fed.Cir. 1993)). The sovereign acts defense "excuses the government from performing a contractual obligation if performance is rendered impossible by a public and general sovereign act." *General Dynamics Corp. v. United States*, 47 Fed.Cl. 514, 533 (2000).

 In order for the Government to be shielded from liability under the sovereign acts defense, the act must be attributable to the government as sovereign rather than the government as contractor; or, in other words, a "public and general" act. *United States v. Winstar Corp.*, 518 U.S. 839, 895–96, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) (plurality). *See also Horowitz v. United States*, 267 U.S. 458, 461, 45 S.Ct. 344, 69

L.Ed. 736 (1925). An act of government will be considered to be sovereign so long as the act's impact on the contracts at issue is "merely incidental to the accomplishment of a broader government objective." *Winstar*, 518 U.S. at 898, 116 S.Ct. 2432. However, an act of government will not be held to be "public and general if it has the substantial effect of releasing the Government from its contractual obligations...." *Id.* at 899, 116 S.Ct. 2432.

 However, even if a court determines that a breach was a sovereign act, the Government will not have the benefit of the sovereign acts defense if it cannot satisfy the common-law doctrine of impossibility. *Id.* at 904, 116 S.Ct. 2432. ("the Government ... must show that the [act] rendering its performance impossible was an event contrary to the basic assumptions on which the parties agreed, and must ultimately show that the language or circumstances do not indicate that the Government should be liable in any case") *See also Croman v. United States*, 49 Fed.Cl. 776, at 781–83 (2001.)

 The suspensions of the contracts were public and general acts because the Forest Service is mandated under section 7(a)(2) of the ESA to consult with the FWS "to insure that any action authorized ... is not likely to jeopardize the continued existence of any endangered species or threatened species." 16 U.S.C. § 1536(a)(2). Section 7(d) of the ESA mandates that the Forest Service may not make any "irreversible or irretrievable commitment of resources" during consultations. 16 U.S.C. § 1536(d). The Arizona district court specifically directed the Forest Service in *Silver v. Thomas* to comply with the ESA by suspending all timber harvesting activities until it consulted with the FWS on the existing LRMPs as required by section 7(a)(2), and by suspending all timber harvesting activities during consultations as required by section 7(d). (Def.'s Mot. at App. 31–32.) Thus, there can be no doubt that the Forest Service's suspensions were taken to comply with its statutory duties (and a court order), and therefore that the acts were "public and general" acts. *See Croman Corp. v. United*

*States,* 44 Fed.Cl. 796, 806–07 (1999), *withdrawn in part,* 49 Fed.Cl. 776, at 782–83 (2001).[44]

Although the suspensions of the contracts were sovereign acts, the Defendant cannot avail itself of the sovereign acts defense because it cannot satisfy the common-law doctrine of impossibility; namely, that it cannot show that the non-occurrence of the suspensions of the contracts were a basic assumption of the parties. *See Scott Timber,* 40 Fed.Cl. at 508. Clause CT 6.01 contemplated that the contracts could be suspended pursuant to a court order, or to "prevent serious environmental degradation." Clause CT 6.25 contemplated that the contracts at issue might be cancelled, modified, or that additional protective measures might be imposed on the contractor in order to comply with the ESA. The Defendant's argument that *Scott Timber* can be distinguished because the Plaintiff here is seeking, in effect, to remove CT 6.01 and CT 6.25 from the contracts at issue is clearly wrong because the Court has not read CT 6.01 and CT 6.25 out of the contract, but instead interprets theses clauses in light of the implied duties to cooperate and not to hinder the contracts. *See* § 5(B), *supra.*

Finally, the Defendant disapprovingly notes that at the same time that the Plaintiff maintains that protective measures and court orders were contemplated by the parties, the Plaintiff "attempts to portray itself as an unsophisticated timber purchaser with no knowledge of any upcoming environmental events and solely dependent upon Government's representations." (Def.'s Reply at 30.) The Defendant's point is well taken. Certainly, the possibility that the Mexican spotted owl might be declared a threatened species would have been no mystery to the Plaintiff. The Plaintiff should have been aware that a petition to list the Mexican spotted owl as a threatened or endangered species was filed with the FWS in 1989, and the FWS issued its proposed rule listing the Mexican spotted owl as a threatened species in 1991. The Plaintiff also should have been aware of the Forest Service's management guidelines to provide protection of the Mexican spotted owl as published in the *Federal Register* and should have been aware of the position of the FWS that the conservation strategy of the Forest Service was inadequate. It is unclear from the record to what extent the Plaintiff was or should have been aware of the Forest Service's position on consultations as represented in some of internal memoranda submitted with this motion. These considerations lead the Court to question whether the Forest Service's failure to timely consult with the FWS was a *"felix culpa"* for the Plaintiff, who up until the suspensions were imposed may have, knowingly or not, benefitted, in the short term, from the Forest Service's risky strategy to avoid suspensions in timber sales by avoiding consultations on LRMPs.

This question, however, is not now before the Court, nor need it be answered to enter judgment as to liability. However, consideration of this issue may well be desirable when it comes time for the Court to determine an appropriate measure of damages in this case.

## IX. Conclusion

The Court finds that the Forest Service breached its implied duty to cooperate with respect to the following contracts: Mud, Monument, Saginaw–Kennedy, Brann, Manaco, Brookbank, and Kettle. The Court also finds that the Forest Service breached its

**44.** The *Croman* court initially held that the suspension of a timber sales contract satisfied the sovereign acts defense because the suspension of the contract, for the purpose of implementing the requirements of the ESA with respect to the listing of the marbled murrelet as a threatened species, was a public and general act. *Croman Corp.,* 44 Fed.Cl. at 807. On reconsideration, the *Croman* court did not change its finding that suspension of the timber sales contract at issue was a public and general act. *Croman Corp.,* 49 Fed.Cl. 776, at 783–84 (2001). However, it withdrew its finding that the suspension satisfied the sovereign acts defense on the ground that, following *Scott Timber* and the plurality Supreme Court opinion in *Winstar,* the common law test of impossibility could not be applied to suspension of the contract because suspensions were explicitly contemplated by the parties and allocated in the contract. *Croman,* 49 Fed.Cl. 776, at 781–82 (2001). *Croman's* updated analysis of the sovereign acts defense is more or less identical to the analysis which this Court adopts.

implied duty not to hinder with respect to the following contracts: Hay, O.D. Ridge, U–Bar, Jersey Horse, Salt, Mud, Monument, Saginaw–Kennedy, Manaco, Brookbank, and Kettle. Therefore, the Court GRANTS, in part, the Plaintiff's cross-motion for summary judgment as to liability and DENIES the Defendant's motion to dismiss or, in the alternative, for summary judgment. The Court ORDERS that a joint status report be submitted within 10 days of the entry of this opinion on further proceedings in this case and in the complaint recently filed by the Plaintiff on July 17, 2001, with respect to the Forest Service's suspensions in 1997 of 6 of the contracts at issue in this case. The joint status report shall contain 3 mutually agreeable days for a status conference no earlier than August 15, 2001.

**IT IS SO ORDERED.**